The Smoot Sand & Gravel Corporation v. Commissioner.
Smoot Sand & Gravel Corp. v. Commissioner
Docket Nos. 31570, 47411, 52015.
United States Tax Court
T.C. Memo 1958-221; 1958 Tax Ct. Memo LEXIS 5; 17 T.C.M. (CCH) 1086; T.C.M. (RIA) 58221; December 31, 1958
David R. Shelton, Esq., Munsey Building, Washington, D.C., for the petitioner. Paul E. Waring, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding is before us on mandate from the United States Court of Appeals for the Fourth Circuit, issued pursuant to that Court's opinion in Smoot Sand & Gravel Corp. v. Commissioner, 241 Fed. (2d) 197, certiorari denied 354 U.S. 922, *6 rehearing denied 354 U.S. 943. The case was remanded to this Court for a redetermination of two of the questions dealt with in the Memorandum Findings of Fact and Opinion of the Tax Court in Smoot Sand & Gravel Corp. v. Commissioner, filed April 10, 1956, involving petitioner's liability for surtaxes under section 102, I.R.C. 1939, by reason of the alleged accumulation of profits for the purpose of preventing the imposition of surtaxes upon its stockholders. We sustained the Commissioner's determination that the petitioner was subject to surtaxes under section 102 of the Internal Revenue Code on its undistributed earnings and profits for the years 1945 to 1950, inclusive. The appellate court concluded its opinion in the following words: "Accordingly, we affirm the Tax Court on all issues except as to the working capital (exclusive of self-insurance reserves) necessary in petitioner's business and as to the ready-mix business, and remand the case to the Tax Court for findings in those respects in accordance with the views expressed in this opinion." Pursuant to the mandate, a rehearing was had before the Tax Court for the purpose of taking additional *7 evidence on these issues. The remanding opinion of the Court of Appeals, together with the further evidence and briefs of the parties on the subsequent hearing on remand, have effected a sharpening of the issues and a clarification of the facts. This requires additional findings, and in some instances modification or revision of the original findings, which we have made herein. Findings of Fact Ready-Mix Issue 1. During the taxable years involved in this proceeding, 1945 to 1950, inclusive, petitioner did not at any time formulate any definite plans, make any commitments, or take any course of action preparatory to entering into the ready-mix concrete business. 2. Petitioner has never at any time intended to enter into the ready-mix concrete business, at least unless forced to do so in order to protect its sand and gravel business. 3. During the taxable period, petitioner's business of producing and selling sand and gravel was not at any time under any threat, either from its customers or its competitors, or from any other source, which might reasonably have been regarded by petitioner's officers as likely to force petitioner to enter into the ready-mix business; and if *8 any such threat ever existed it did not extend beyond 1940 at the latest. 4. During the taxable period involved, petitioner's officers had no reasonable cause to consider petitioner's entry into the ready-mix business as more than a remote possibility, or to accumulate petitioner's earnings and profits for that purpose. Opinion In regard to the ready-mix issue, the crucial questions which we must decide, under the appellate court's mandate, [1] are whether, in the circumstances as they existed in the taxable period, petitioner's officers might reasonably have concluded that there was sufficient likelihood of petitioner being forced into the ready-mix concrete business to justify the accumulation of a sufficient amount of earnings and profits for that purpose; and, if so, what would have been a reasonable amount for such reserve. *9 In our original findings of fact we found that, in the opinion of petitioner's officers, the actions of the ready-mix concerns in the vicinity of petitioner's business posed a serious threat to the continuation of the business as operated by petitioner, and that petitioner might eventually be forced into the ready-mix business itself. [2] This finding was based on the testimony of petitioner's officers as to their state of mind during the critical period, some 6 to 10 years previously. We did not find that any such threat to petitioner's business constituted a reasonable need for a cash reserve sufficient to equip the petitioner for entry into the ready-mix business on a competitive basis, or what would have been a reasonable amount for such a reserve. *10 We are admonished by the appellate court that "the Court should have determined when, if at all, the threat terminated and became too remote a possibility to justify reserves." The record does not show when this took place. It is entirely silent as to any further activities against petitioner by the ready-mix companies or any subsequent attempts to threaten petitioner or force it to reduce its prices. The reserve for this purpose was established about 1936 and was never disturbed thereafter. If we are required to make a finding as to when any threat from the ready-mix industry against petitioner terminated, it would have to be the latest date shown by the record, which was not later than 1940. As far as has been shown, no threats were suggested after the 1930's. There is no showing whatever of any subsequent actions on the part of the ready-mix people which would justify petitioner's claim of intimidation by them. And the testimony of the ready-mix representatives indicates that they dared not, and hence presumably did not, antagonize petitioner. In the absence of affirmative evidence we are unable to make a finding as to exact dates, but based on what testimony there is, we have *11 reached the general factual conclusion, as set forth in our findings, that any threat that may have existed did not extend beyond 1940. If this is inconsistent with our previous findings, then, on the whole record as supplemented at the further hearing, we must regard those findings as erroneous, at least by implication, and accordingly revised as stated above. The testimony of petitioner's witnesses indicates that the purpose of maintaining the ready-mix cash reserve was primarily to deter the ready-mix people from undermining petitioner's business and to support petitioner's counterthreat to enter the ready-mix business itself in competition with them. It is claimed that as long as the ready-mix people knew that petitioner had the financial means of launching its own ready-mix business they would not dare push the petitioner into direct competition with themselves. We originally concluded that the reserve of $500,000, which petitioner set up in its books, was sufficient for that purpose. Even yet petitioner has not had to enter into the ready-mix business or to take any further deterring action against the ready-mix people. The evidence taken as a whole, including the testimony *12 on this point given at the first trial, coupled with the evidence adduced by petitioner's own witness at the rehearing, shows affirmatively that petitioner was in a strong economic position with more demands on its production than it could meet; [3] that there was no threat to its business from any existing or even imaginary competitor; [4] that petitioner far from being threatened as to its sand and gravel business by the ready-mix companies was itself a threat to their very existence, both because of its dominating position in the production of sand and gravel and even more so, because of its potential, by entering into the ready-mix business, of putting out of business all of the ready-mix concerns in the area. [5] We think petitioner's officers must have known of this situation and that they accordingly could not by 1945 have reasonably felt that they were threatened by any ready-mix operations or would have to enter the ready-mix business to protect themselves. Any decision to enter into the ready-mix business would have been for the purpose not only of expanding the sand and gravel production but of taking over the entire ready-mix business for the whole area. [6] This incidentally *13 was not at all what Mr. Smoot originally envisaged, or for all that appears, ever intended. He said in 1934: "The only way to meet this very serious threat is to be ready - and to let the ready mixer know it - to step boldly into the ready-mixing business and compete with them on their own ground. * * * thirty to forty such trucks would be required at the outset." Even if taking over the entire ready-mix business was a possibility, it would certainly not be a need of the business, reasonable or otherwise, and could not have been so considered during the period in question by petitioner or its officers. *14 This ruling disposes of the ready-mix issue in compliance with the mandate of the appellate court, without necessity for the discussion of the amount of cash that would have been needed for petitioner's entry into the ready-mix business. In any event, we do not think that petitioner had need for any greater amount in its ready-mix reserve for any of the taxable years than the $500,000 which it carried in its books. The only other figure appearing is in the millions of dollars running as high as over $11,000,000 in 1950. No other evidence between these two amounts appears anywhere in the record, and there is no basis on which a smaller figure than that proposed by petitioner could be found except the $500,000 already allowed. Petitioner suggests that it could not deter its ready-mix customers from threatening its sand and gravel business without the financial resources, running into many millions of dollars, with which it could itself engage in extensive ready-mix operations, and in the same breath that it lacked any such resources. It seems to us difficult to see how petitioner can be correct on both contentions. We know that the hypothetical ready-mix competition did not materialize. *15 If we accept petitioner's theory and assume that it needed - and lacked - liquid assets to embark on the ready-mix business and impress the ready-mix concerns with its financial power, then it presumably had other resources like those of petitioner's direct and indirect stockholders [7] which would also have been available to it in any possible emergency. [8]
*16 We are convinced that with petitioner's long and successful business history, and its widely-known strong financial position, no large amount of ready cash was required as a restraint on the ready-mix people. Nor is there any showing that with its record of large earnings and its surplus and cash reserves of over $6,000,000, petitioner would not have been able at any time to secure sufficient credit to enter the ready-mix business on a scale conformable to any plans which it ever had in contemplation. On this issue we conclude that there was no reasonable need of the business in any of the instant years to accumulate any amounts whatever for the ready-mix purpose. Working Capital Issue In our original opinion we adopted the generalization suggested in J. L. Goodman Furniture Co., 11 T.C. 530, that a reasonable working capital reserve could be allowed in a sufficient amount to cover petitioner's operations for an entire year. The appellate court has found that this basis for determining working capital is not appropriate here and has directed us, in determining petitioner's working capital, to give consideration to "the nature of the business, its credit policies, *17 the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors." Findings of Fact Petitioner's business consisted solely of the production and sale of sand and gravel which it obtained principally by dredging operations from underwater deposits along the bed of the Potomac River below Washington and adjacent waters. The sand and gravel are transported by barge to petitioner's distributing plants in the District of Columbia where they are sold and delivered to petitioner's customers. These customers consist, for the most part, of ready-mix concrete concerns operating in the vicinity of Washington. Most of petitioner's sales of sand and gravel, at least during the 1945-1950 period, were for cash, payable within 30 to 60 days. There was a rapid turnover of inventory and accounts receivable. The average inventory turnover period during the taxable years was less than 4 days. The average closing inventory of sand and gravel, "Finished Goods," at the end of each year was not over $5,000. The "Raw Materials" inventory was even less. Petitioner's balance sheets *18 for the taxable years show net liquid assets, including cash, notes receivable, accounts receivable, investments, inventories, and securities, exclusive of loans, averaging over $4,500,000 and current liabilities, consisting of notes and accounts payable, and reserves for Federal and District of Columbia income taxes, averaging approximately $180,000. The cost of goods sold varied from approximately $490,000 to over $778,000 with an average for the 6-year period of $600,000. Other expenses, including depreciation and depletion, averaged approximately $560,000. Petitioner's total annual outlay for current expense including cost of goods sold for the 1945-1950 period, as reflected in its books and records, averaged not over $1,160,000. Petitioner's needs for working capital, based on actual operations, were not in excess of $500,000 at any one time during the 1945-1950 period. Opinion It is plain, from the above facts, that petitioner's needs for working capital were unusually small for a business of its magnitude. Its inventories of sand and gravel were almost insignificant. [9] It had a rapid turnover of both inventory and accounts receivable. It sold its products for cash *19 payable within 30 to 60 days. Only a portion of its total expenses for any year was required at any given time. As already pointed out, we are unconvinced that there was any limitation, within reasonable bounds, on petitioner's credit. Certainly it was ample for any foreseeable needs that may have arisen for working capital. Although the appellate court has rejected the basis upon which our allowance of $500,000 as a reasonable working capital was determined, that amount seems more than ample for petitioner's working capital needs, giving due consideration to all pertinent factors, *20 including those set out in the appellate court's opinion. The evidence now before us and the application thereto of the considerations outlined in the opinion of the Court of Appeals make it clear that petitioner's operations were such as to require a working capital reserve for very much less than a full year. As the accompanying figures show, even including a reasonable allowance for depreciation and depletion, petitioner's working capital requirements would not have been in excess of between about $200,000 and $350,000 at any given time for the years under consideration. While our original reference to $500,000 for this item thus appears excessive, we have not reduced it in the table showing the ultimate conclusions at which we have now arrived. The following figures represent the best estimate we have been able to make, on the evidence before us, of petitioner's working capital needs for each of the taxable years: Reasonable
Year
Working
Capital
1945
$201,997.45
1946
191,693.94
1947
197,557.52
1948
248,191.08
1949
351,667.37
1950
333,826.67 In making this computation of petitioner's working capital, we have considered all of petitioner's expenses *21 as shown in its profit and loss statements, including both direct and indirect expenses, cost of goods sold, Federal income and other taxes, and depletion and depreciation allowances; and we have accepted for this purpose petitioner's contention that the computation should be based on the amounts outstanding in the months of greatest activity of each year. The following table shows the figures for petitioner's "reserves" as referred to in the opinion of the Court of Appeals (supra at 201), petitioner's additional surplus not earmarked, the maximum amount which on the whole record we have been able to conclude was reasonable for petitioner to carry as reserves for any purpose, as well as the maximum amount for loans to customers and working capital, leaving a final figure denominated "unreasonable accumulation" which is the minimum amount we have determined to have been accumulated at the end of the years indicated beyond any reasonable needs of petitioner's business and for no other purpose than to avoid the imposition of the surtax upon petitioner's stockholders: 12/31/45
12/31/46
12/31/47
Reserves per books
$4,298,728.25
$4,347,084.39
$4,464,566.42
Surplus not "Earmarked"
2,088,596.99
2,276,848.46
2,543,351.52
Total surplus
$6,387,325.24
$6,623,932.85
$7,007,917.94
Less: Reserves accepted as reasonable
$4,298,728.25
$4,347,084.39
$4,464,566.42
Loans to customers
72,917.00
135,000.00
Working capital
500,000.00
500,000.00
500,000.00
Unreasonable accumulation
$1,515,679.99
$1,776,848.46
$1,908,351.52
*22 12/31/48
12/31/49
12/31/50
Reserves per books
$4,623,732.11
$4,566,666.38
$4,738,103.32
Surplus not "Earmarked"
2,618,292.96
2,697,915.75
2,908,702.60
Total surplus
$7,242,025.07
$7,264,582.13
$7,646,805.92
Less: Reserves accepted as reasonable
$4,623,732.11
$4,566,666.38
$4,738,103.32
Loans to customers
$ 150,000.00
$ 92,505.00
Working capital
500,000.00
$ 500,000.00
500,000.00
Unreasonable accumulation
$1,968,292.96
$2,197,915.75
$2,316,197.60
The above term "reserves accepted as reasonable" has been used to indicate that although in some cases the items included are doubtful as to character or amount, the benefit of that doubt has been extended in petitioner's favor. In several instances the original opinion accepted the reserves established on petitioner's books as being some evidence of the amounts reasonably required for the purposes specified. The court on review has decided that in the case of the two issues now before us the existence of book reserves is not sufficient for the conclusion that such amounts were adequate. The Court of Appeals adds: "* * * nor is the mere book entry conclusive, in a Section 102 case, *23 that the reserve is for a reasonably anticipated business need." The consequence is that as to a number of items on which the amount of the reserve was virtually the only evidence of a reasonable figure for the business needs, we may have fallen into error in viewing them as a proper measure of reasonable accumulations. Such items are, for example, $500,000 for ready-mix as originally allowed although it now appears that this allowance is overgenerous, reserves for Federal income taxes and contract bonds. Since, however, we regard these issues as no longer open upon the remand, we have retained the original figures in our summary. Findings of Fact Burden of Proof Issue The original hearing in the proceedings before the Tax Court began June 14, 1954 and ended June 22, 1954, approximately 1 year before the effective date of the section 534 amendment. The notices of deficiencies for the years involved were based on the petitioner's liability for section 102 surtax by reason of having permitted its earnings and profits to accumulate for the purpose of preventing the imposition of surtax upon its stockholders. Opinion The parties raised the question as to the burden of proof *24 under section 534, I.R.C. 1954, as amended by Pub. L. No. 367, [10] enacted August 11, 1955, at the rehearing on the issues now under consideration. Arguments on the questions are presented on briefs. *25 Petitioner's contentions are that, as to the issue now before us, there were "proceedings tried on the merits," that is, at the hearing on the Court's mandate, after the enactment of the August 11, 1955 amendment to section 534, I.R.C. 1954. The fact is that the case was tried on the merits before the enactment of the amendment. The sole issue in that trial, as in the present one, was whether petitioner was availed of for the purpose of preventing the imposition of surtax upon its stockholders through the medium of permitting the accumulation of earnings and profits. The rehearing before the Tax Court was merely a reopening of the proceedings for the purpose of taking further testimony on the ready-mix and working capital issues. The order of this Court setting the case for rehearing, dated April 16, 1958, [11] so stated. *26 The procedure apparently envisaged by the 1954 Code and 1955 amendment is that when new deficiency notices were contemplated involving prohibited accumulations, the Commissioner would send a preliminary notice to this effect. The taxpayer might then respond with an assertion of the permitted purposes of the accumulation, and within the boundaries of that response the Commissioner would have the burden of proof. If a deficiency notice had already been issued but the case had not yet been heard, the Commissioner could send a subsequent notice within 30 days after the passage of the statute (that is between August 11 and September 10, 1955) which would have the same effect as though it had been sent out prior to the notice of deficiency. Presumably then at any subsequent trial the burden would be on the Commissioner on any subjects covered by petitioner's response. In either event, the failure of the Commissioner to send the requisite notice might shift some part of the burden of proof to him, even without any statement from the taxpayer. See Egan Estate v. Commissioner, (C.A. 8) - Fed. (2d) -, affirming 28 T.C. 998. Petitioner's contention here is that the burden is *27 on respondent not because petitioner has sent the response envisioned by the statute but because the Commissioner has failed to send the notice which the statute contemplates. The only time respondent could have sent out such a notice was the 30 days between August 11, 1955 and September 10, 1955. No other possibility exists under the legislation. But that was approximately a year after the case had been heard and while its decision was pending in the Tax Court, final briefs having been filed June 27, 1955. It thus would have made no discernible contribution to the proceedings whatever for the respondent at that time to have served the statutory notice or for petitioner to have filed any response. Parenthetically, it may be added, though it may be too obvious to require comment, that the dispatch of the preliminary notice after the decision on appeal would not have been timely under the amendment. We think it could not conceivably have been the congressional purpose to place the respondent in default under such circumstances or to have imposed the burden of proof in the present case upon him because a futile and confusing notice has not been sent. Our conclusion is that the statute, *28 in order to effect its obvious intent, should be construed as though it read "[this] section shall apply only in the case of proceedings first tried on the merits after" etcetera. See Haggar Co. v. Helvering, 308 U.S. 389. And nothing in the legislative history showing the objective of the statute or the situation to be remedied by it indicates the contrary. See Pelton Steel Casting Co., 28 T.C. 153, affd. (C.A. 7) 251 Fed. (2d) 278, certiorari denied 356 U.S. 958. This interpretation makes it unnecessary to consider whether a hearing on remand is or is not a trial "on the merits" either generally speaking or within the language of the applicable section. Regardless of these considerations, even assuming that the 1954 amendment applies, the presumption of correctness attaching to respondent's over-all determination still remains. Pelton Steel Casting Co., supra. The size of the accumulations, the regularity and continuity of an apparent business policy which has eliminated practically all dividends during petitioner's entire history, and the testimony adduced by petitioner itself all carry the strong inference *29 that if any other motive for the accumulations existed, except that inhibited by section 102, it was purely incidental, subordinate or fictitious. Having concluded that no figure for the reasonable needs of the business could at any relevant time conceivably justify more than a portion of petitioner's enormous accumulated resources, we think it follows petitioner has not sustained its fundamental and primary burden of proof. On the contrary, the evidence and the necessary implications therefrom affirmatively show a deliberate, consistent and inescapable intention on the part of petitioner to retain its net earnings for the purpose of avoiding the surtax upon its immediate and ultimate stockholders. Decisions will be entered for the respondent Footnotes
1. "The Court [Tax Court] might have disagreed with the Petitioner that it had reasonable ground to feel such a threat [of being forced into the ready-mix business], or it may well be that the threat disappeared and was reduced merely to a remote possibility. If so, then from that time forward, the continued maintenance of the reserve would not have been proper. "* * * "Accordingly, we think the Tax Court should decide whether petitioner reasonably believed that it would likely be forced into the ready-mix business during any of the taxable years in question and, if so, what sum was needed therefor. "* * * "* * * The Tax Court may well give weight to the fact that only $500,000.00 was set up in this reserve and that this figure was not changed during the period covered by this case. Or the Court may conclude that the idea of going into the ready-mix business is not genuine, but merely a fictitious facade to cover an unreasonable accumulation of surplus; if so, it may disallow the item in its entirety."↩
2. "In the meantime, the ready-mix concerns began demanding certain price concessions and other concessions which petitioner was unable or unwilling to grant, and transferring as much of their business as possible to petitioner's competitors. By 1945 this situation had reached the point where, in the opinion of petitioner's officers, it constituted a sever threat to petitioner's business. Petitioner was confronted with the alternative of going into the ready-mix business itself or losing the major portion of its sand and gravel market. * * * "At one time when the strained relationship between petitioner and the ready-mix concerns approached a climax, petitioner made an estimate of the additional facilities and equipment that it would need to go into the ready-mix business itself, and engaged a 'stand-by' salesman to handle the order. A break with the ready-mix concerns was averted, however, and at the present time they are purchasing from 50 to 80 per cent of petitioner's production of sand and gravel." (T.C. Memo. 1956-82↩.)
3. In the original opinion we found: "Petitioner has not been able to supply the requirements of its customers for sand and gravel since about the beginning of World War II. In 1943 it inaugurated a system of allocating material to its customers which has continued up to the present time. In some instances customers' requirements had to be cut in half." ↩
4. "THE WITNESS: If we weren't prepared to go into the ready-mix concrete, I think they could destroy us, yes. "THE COURT: What class of people would this be? "THE WITNESS: It is highly possible, Your Honor, that an outsider would come in here to a company like Super, for instance, and say to them, 'I have sufficient capital. You come to me and we'll control the business in the District of Columbia and environs of the District of Columbia. I will go into the sand and gravel production business, we will merge and control this market.'" ↩
5. "Q. [To Mr. Simpson, president of the largest ready-mix company in the area] * * * What would happen to your business if Mr. Smoot went into the ready-mixed concrete business? "A. I think that we would be soon out of business before long because I am not in the sand and gravel business. I couldn't compete with him." ↩
6. "Q. Why in your estimates, Mr. Simpson, have you assumed that the Smoot Company would be required to go into the ready-mixed business on a 200 mixer truck basis? "A. For the reason that that amount of business was transacted prior to this period just before we entered the war and in my opinion if the Smoot Company should enter the ready-mix business, they would have no choice but to go all the way into the business. "Q. Wouldn't the others stay on and compete, in your opinion? "A. I can't answer for the others, but our company has had a policy for so many years of purchasing mobile equipment only. We have not purchased land and we have been prepared to go out of the business should the Smoot Company enter the business. "Q. Why have you kept yours on a mobile basis, as you describe it, and not purchased land? "A. In order that we might sell or get out, move to another location. We wouldn't care to compete in this market without - couldn't compete in this market without a material source."↩
7. "THE COURT: Therefore, I have to ask you the question, why are you still in business? If you would not have been able to stay in business, if you weren't prepared - and that means, according to you, financially prepared - to go into the ready-mix business, when you tell me in the same breath you weren't prepared? "THE WITNESS: Because we have two entities to which we can turn for funds, namely the Columbia Sand & Gravel Company and Mr. L. E. Smoot. "THE COURT: Did you not in your testimony point out that they were both involved in this litigation, too? "THE WITNESS: Yes, but I think there are sufficient funds in there to advance us money in the case that we got into such a turmoil. "THE COURT: You do think so? "THE WITNESS: I do think so, yes, sir." ↩
8. We note the comment of the Court of Appeals which in effect rejects the rationale of Helvering v. National Grocery Co., 304 U.S. 282, that: "Since Kohl was the sole owner of the corporation, the business would have been as well protected against unexpected demands for capital, and assured of capital for the purpose of any possible expansion, by his personal ownership * * * as by the corporation's owning them." We are not, of course, attempting to take issue with this position of the Court of Appeals. It is unnecessary to our conclusion to speculate as to what would have been the consequence had petitioner's sole stockholder secured the benefit of the distribution of its earnings by way of dividends. We cannot assume, however, that what is meant by that part of the Court of Appeals opinion is that the imposition of the surtax upon the stockholders and the consequent diminution of their resources would automatically justify the accumulation of earnings by a corporation in order to avoid the imposition of that surtax. As we said in Latchis Theatres of Keene, Inc., 19 T.C. 1054, 1065, affd. (C.A. 1) 214 Fed. (2d) 834: "The only disadvantage that this record shows in such a procedure [distributing the earnings of the petitioners to their stockholders so that those individuals could use those funds] is that it would have subjected the stockholders to additional taxes, the very result which section 102 was designed to promote. Helvering v. Chicago Stock Yards Co., 318 U.S. 693↩."
9. At the hearing petitioner attempted to show "that the company needed an inventory of at least three hundred thousand cubic yards of sand and gravel during 1945 to 1950 period." This evidence was rejected. Petitioner's actual operations having been conducted without any such inventory, our determination should be based upon the evidence of "the nature of the business" carried on by petitioner and of petitioner's actual operations. We regard this new issue of petitioner's requirement for a multifold increase in the inventory which it actually carried, as outside the issues open to us on the remand.↩
10. "SEC. 534. BURDEN OF PROOF. "(a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - "(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or "(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. "(b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day. "(c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. "* * * "(e) Application of Section. - "(1) Notwithstanding any other provision of law, this section shall apply with respect to taxable years to which this subchapter applies and (except as provided in paragraph (2)) to taxable years to which the corresponding provisions of prior revenue laws apply. "(2) In the case of a notice of deficiency for a taxable year to which this subchapter does not apply, this section shall apply only in the case of proceedings tried on the merits after the date of the enactment of this paragraph."↩
11. "This case was called from the motions calendar at Washington, D.C., on April 16, 1958 on petitioners' motion to take further evidence pursuant to mandate. The motion was argued by counsel for the parties and after due consideration, it is "ORDERED: That the petitioners' motion of January 20, 1958 is granted and the above-entitled case is set for trial for further testimony pursuant to mandate at 10:00 A.M. on May 19, 1958 in Courtroom No. 2, 12th and Constitution Avenue, N.W., Washington, D.C."↩