LATCHIS THEATRES OF KEENE, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LATCHIS THEATRES OF CLAREMONT, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28204, 28205. Promulgated March 11, 1953.

*Bennett Sanderson, Esq.*, for the petitioners.
*William C. W. Haynes, Esq.*, for the respondent.

1058

OPINION.

Murdock, *Judge:* The only ground on which the Commissioner seeks to support his determination of surtax under section 102 is that the earnings or profits of each petitioner were permitted to accumulate in 1946 beyond the reasonable needs of the business. Section 102 (c). Keene accumulated and added to its surplus during 1946 earnings of $16,645.82, and Claremont accumulated and added to its surplus during 1946 earnings of $7,704.13. The petitioners attempt to justify those accumulations on three grounds: (1) "The demands for payments on mortgages on the theatres in which the petitioners operated their business"; (2) "The need to replace equipment in the theatres"; and (3) "The need to meet competition as it had arisen in the past and might arise again at any time from other and larger theatre chains and as it was developing in 1946 from drive-in theatres."

It must be borne in mind that each petitioner can escape the Commissioner's determination only if it shows that its accumulations for

1946 were reasonably needed in its business. The fact that they might have been needed or that they were actually used in the business of some other entity is wholly immaterial unless it is shown that such needs or use were in fact reasonably necessary to the business of the petitioner. Cf. *Stanton Corporation*, 44 B. T. A. 56, 80, affd. per curiam 138 F. 2d 512. The members of the Latchis family, operating as a closely knit group, developed rather extensive business interests of which the two petitioner corporations were but a part. The record indicates that the individuals used the various organizations and particularly the funds of those organizations, including the funds of the petitioners, to suit their own convenience, now to start or aid one activity, again to start or aid another. Apparently, the petitioners were on the receiving end in their early days, until they had gotten started successfully, and then idle funds of the petitioners, even in excess of accumulated earnings, were used at the will of the individuals for any purpose of any part of the various businesses which they were conducting. Those purposes, so far as this record shows, were not germane to the business of the petitioners except as they may have enabled the individuals to build up and strengthen their business domain generally. The Latchis family could have put all of their properties in one corporation and operated all of their businesses through that corporation. Then the arguments they make here that the earnings of one activity can be retained to aid or develop another phase of the business would have more force. But they chose, instead, to divide their holdings and business activities among a number of separate corporations in order to limit liabilities and perhaps to obtain other benefits. They must be judged by what they did in this respect rather than by what they might have done. Attention must be focused upon the petitioners. The accumulation of the 1946 earnings of the petitioners, on top of the earnings and capital which they already had, can not be justified by various needs and purposes of other interests of the Latchis family businesses.

The Court, during the course of the trial, repeatedly called the attention of counsel for the petitioners to the necessity of explaining specifically and adequately the business need of each petitioner for retaining all rather than distributing some or all of its 1946 accumulation of earnings. Two of the brothers testified. The explanations given in their testimony are too vague, general, inferential, and indefinite in important respects and are not reduced to amounts of money required to meet needs and reasonable prospects of either petitioner. Their explanations would relate with equal inadequacy to one-half or twice the amounts as well as they do to the actual amounts which need explanation. No effort was made to show the amounts needed

by either petitioner in the normal month to month operation of their businesses and examination of the balance sheets and observation of the actual uses made of their funds, particularly loans of those funds, indicate that neither petitioner needed or used more than a few thousand dollars for that purpose.

Counsel for the petitioners states in his brief "The most pressing need in 1946, in part met in that year, was the demands for payments on mortgages on the theatres in which petitioners operated their business." Neither petitioner acquired any real estate and it was not intended that either should ever acquire any real estate. Neither petitioner was ever liable on any mortgage. The mortgages to which counsel for the petitioners refer were mortgages which D. Latchis, Inc., had placed, on properties belonging to it, as security for funds borrowed by it. The record does not show the purpose for which any of the money was borrowed or that it was borrowed for any purpose connected with either petitioner. The properties mortgaged have not been described but there are indications in the record that they were not merely theatre properties but contained, in addition to the theatres, other rental space. John testified that there was pressure from the mortgagees for payments in 1946. The petitioners' contention in this connection seems to be that a reasonable need of the business of each petitioner was to have sufficient funds to come to the aid of the mortgagor, D. Latchis, Inc., so that it would not lose the properties and thereby deprive the petitioners of theatres in which to operate their businesses. Factually, this argument would be much stronger if the theatre properties had been the only security and D. Latchis, Inc., had had to borrow the money and mortgage those properties in order to obtain them for the use of the petitioners. But no such findings can be made from this record. The actual facts may be that the theatre space was much less valuable than the rest of the mortgaged property and that D. Latchis, Inc., borrowed the money for purposes unrelated to the petitioners. Almost 45 per cent of its rental income was from other sources, indicating that it had other valuable properties in addition to those rented to the petitioners. It was lending others in its chain more than it was borrowing. Obviously, the petitioners can not justify accumulation of surpluses sufficient to make certain that D. Latchis, Inc., will be able to meet all of its varied obligations in the conduct of its business, much of which had nothing to do with these petitioners. We are unable to find that either corporation was justified in accumulating any earnings to assure payment of mortgage obligations of D. Latchis, Inc.

The petitioners' counsel stated "Almost equally pressing, but impossible to meet in 1946, was the need to replace equipment in the theatres." This argument needs careful scrutiny to determine just

how meritorious it is. These petitioners had been buying equipment needed in the operation of the theatres such as projection and sound equipment, ticket registers, and other similar items, and some additional or replacement equipment of that character was a reasonable need. However, whatever they might have needed could easily have been obtained with a relatively small part of the excess funds which they had at the beginning of 1946. It does not appear that such needs in the case of either theatre would have gone beyond a few thousand dollars at any time material hereto. Therefore, if section 102 is not to apply because 1946 earnings would be needed to buy equipment, it must be explained by the need for such articles as chairs, light fixtures, and carpet for the theatres.

The record does not indicate that either petitioner in the past had ever invested any more than a nominal amount of its funds in any such articles but, on the contrary, D. Latchis, Inc., the owner of the theatres, had expended large sums in equipping its theatres with seats, light fixtures, and carpet. John testified "The policy became that the furniture and fixtures would be owned by the Theatres" and he may have meant that after 1937 D. Latchis, Inc., would not buy chairs, carpet, or light fixtures for the theatres but such furniture and fixtures would be bought by the operating companies. No finding on that testimony has been made because there is nothing but his statement to support it as to time, and other evidence indicates that the change in policy occurred after 1946. Cf. *Whitney Chain & Mfg. Co.*, 3 T. C. 1109, affd. 149 F. 2d 936. It was difficult and sometimes impossible to obtain furniture and fixtures of this kind after 1941 but, if the change in policy was fixed in 1937 and if the furniture and fixtures were as old and worn out as the petitioners would have the Court believe, then it seems odd that the petitioners did not buy substantial quantities of such furniture and fixtures when it was available during the 5 years preceding 1942. D. Latchis, Inc., bought $4,000 worth of unidentified furniture and fixtures for Claremont in 1942 and $2,800 worth of carpet for another theatre in 1943 and 1944. Claremont never bought any chairs, carpet, or light fixtures for the theatre which it operated in 1946 until 1951. Keene had never bought any seats, carpet, or light fixtures for any theatre operated by it in 1946 until 1949. The evidence, as a whole, is not convincing in support of the petitioners' contention that the policy was established in 1946 of having the operating companies buy seats, carpet, and light fixtures whenever any were required for the theatres which they operated but did not own.

If such a policy had been established as early as 1946, there would still be the question of the amounts reasonably needed. The seats were old and in poor repair in 1946 and the petitioners began to replace

them in 1949, but there is no evidence of what amount the officers of the petitioners thought in 1946 they would need for that purpose. Keene had a total of capital stock, donated surplus, and earned surplus at the beginning of 1946 of over $72,000, only a small part of which was used in its business. The record does not show that the unused portion of those funds was inadequate to meet any needs for seats, carpet, light fixtures, and other equipment reasonably foreseeable in 1946. Claremont, at the beginning of 1946, had capital and earned surplus of about $24,000, only a small part of which was apparently used in its business. The record does not show that the portion of those funds in excess of current operating needs was not adequate to meet any expenditures for seats, carpet, light fixtures, and other equipment reasonably foreseeable in 1946. Actually, Claremont did not use any of its funds for "furniture and fixtures" until 1951, although Keene was buying seats in 1949. The record indicates that Claremont took on the operation of another theatre after 1946, an event which was not anticipated in 1946 so far as this record shows, and that circumstance complicates the record so that it is difficult to determine just what Claremont spent later for equipping the one theatre which it operated in 1946. The Latchis men were thinking in a general way in 1946 about improving their theatre furnishings and equipment when circumstances would justify and permit. However, the theatres had been consistently profitable, using the furniture and fixtures and other equipment on hand. The evidence does not show a definite plan or estimate of amounts needed in 1946 to do any specific thing to improve the furnishings or equipment of any theatre being operated by the petitioners. The Court does not doubt that some of the funds of each petitioner, not needed and not used in the routine operation of its business in 1946, were nevertheless justifiably retained because of future needs of the business then reasonably foreseeable. However, these petitioners must show that such needs probably would require all of the funds they had available at the end of 1952 and in that they have failed.

The petitioners summarize their final argument by saying "Continually in the background was the need to meet competition as it had arisen in the past and might arise again at any time from other and larger theatre chains and as it was developing in 1946 from drive-in theatres." The amounts which Peter owed to the petitioners and to D. Latchis, Inc., are prominent in this portion of the petitioners' argument. They say that those funds in his hands were "to meet competition, to acquire theatre properties, and to meet other needs of the petitioners, and the other theatres in the groups as needs for cash might arise." Here again, attention must be focused on the needs

of the petitioners while disregarding the needs of other elements of the Latchis chain of ownership of various businesses and business properties. The petitioners were not real estate owners. The policy of the Latchis brothers was to hold their properties in small corporations in order to limit liability, and no contention and no showing is made that either petitioner was contemplating expansion of its own business or needed any of its funds for that purpose. Retention of earnings by the petitioners can not be justified on the ground that they were needed to take care of other theatres within the Latchis group. Peter bought an interest in a theatre operation in Windsor, Vermont, and eventually brought that activity into the group. Funds of the group were used to build a new theatre in Brattleboro, Vermont, and a property on which a grain business was operated in Keene was bought, but it does not appear that such transactions in any way benefited the petitioners. They increased the Latchis operations but why they would be a benefit to either of the petitioners does not appear. Peter, prior to 1940, bought a property next to one of the Keene theatres in order to prevent a potential competitor from obtaining it, but the needs of the petitioners' business could not include enough funds to buy up all available theatre sites as a means of preventing competition, particularly where the petitioners were not holding any real estate. Peter testified that the ownership of more than one theatre was not an advantage in obtaining film. The record is not clear as to just when any threat of competition from drive-in theatres developed in New England. It may have been a little after 1946, but if it was apparent in 1946, the question would be to what extent in dollars did it justify the retention by either petitioner of earnings of 1946. It is not suggested that either petitioner in 1946 contemplated meeting this threat by trying to obtain the right to operate a drive-in theatre. Instead, the threat was to be met by air conditioning the theatres. Why air conditioning of a building should be the responsibility of the tenant on an oral lease rather than that of the landlord is not apparent, but the petitioners did pay for air conditioning equipment beginning in 1950. The record does not show the extent, if any, to which these expenditures were reasonably anticipated in 1946.

The Latchis family could as well serve the interests of their other corporations and of their over-all business holdings and activities by distributing the earnings of the petitioners to their stockholders so that those individuals could use those funds in their other activities in any way that they desired. Cf. *Stanton Corporation, supra; Helvering v. National Grocery Co.,* 304 U. S. 282. The only disadvantage that this record shows in such a procedure is that it would have subjected the stockholders to additional taxes, the very result which section 102

was designed to promote. *Helvering* v. *Chicago Stock Yards Co.*, 318 U. S. 693. The so-called "fund" in Peter's hands is one of the strongest points against the petitioners. Cf. *Helvering* v. *National Grocery Co., supra; United Business Corporation* v. *Commissioner*, 62 F. 2d 754, certiorari denied 290 U. S. 635. He borrowed from the corporations without interest, without notes or other evidence of indebtedness beyond the books. He invested the amounts borrowed principally in stocks and he retained the dividends and profits from the stocks as his own. Thus, he had all the benefits of a distribution of the funds of Keene during all of 1946 and of some of the funds of Claremont for an undisclosed part of 1946 without the disadvantage of the corporations paying a dividend which would have been taxable to him. John also held funds owing to the petitioners. Neither corporation had ever paid a dividend and there is no evidence that they ever intended to pay one.

The stipulation shows, and it is not denied, that distribution of the earnings of the petitioners for 1946 to their stockholders would have resulted in surtaxes upon those shareholders. The evidence when taken in its entirety justifies the findings that each petitioner in 1946 permitted its earnings or profits to accumulate beyond the reasonable needs of its business, and each petitioner was availed of during 1946 for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

ARUNDELL, *J.*, dissenting: We are dealing in these cases with a penalty statute and it would seem to me that we should hesitate before we substitute our judgment for the judgment of the directors of petitioners and find that the small accumulations that were added to surplus in 1946 by each of these taxpayers were beyond the reasonable needs of their businesses.

The record contains evidence of factual situations which confronted the petitioners and which prompted the accumulation of earnings. One was the constant threat of competition from the larger chains of theatres and, whether this danger was real, the petitioners honestly believed that it was, as evidenced by the acquisition of theatre sites by the Latchis group from time to time in order to forestall the incursion of their territory by chains. Second, there was genuine need in 1946 for relatively costly renovation and re-equipment of petitioners' theatres. The third situation grew out of the fact that the persons holding mortgages on the theatres were demanding that they be curtailed due

to the fact that the theatres had been allowed to get in a run-down condition. While the mortgages were primarily the liability of D. Latchis, Inc., which owned the theatre properties, nevertheless, if petitioners were to remain in business, foreclosure on the properties had to be averted and to accomplish this they had to stand ready to advance the funds required for curtailment. Advances so made in 1946 by Keene amounted to some $26,000 and by Claremont to $14,000.

Upon the facts present in these proceedings, it my view that the business of the petitioners and of D. Latchis, Inc., should be regarded as merely branches of the same business. All have the same stockholders and officers. The petitioners were the active operators of properties owned by Latchis, and while Latchis was the record owner, the petitioners assumed the role of ownership to the extent of furnishing improvements and making provision for reduction of mortgages.

I do not think that the loans to stockholders can be regarded as significant. The only loans of any importance were to Peter Latchis and those loans were made for the specific purpose of being used by him for the protection of the business of petitioners. The amounts advanced to him were carried as loans as a bookkeeping matter but, from a practical point of view, they were merely held by him in escrow for the benefit of petitioners.

We have recently said in *Crawford County Printing & Publishing Co.*, 17 T. C. 1404, that:

Determination of the reasonable needs of its business is, in the first place, a task for the officers and directors of the corporation. What is reasonable in one situation may be unreasonable in a different context of facts. We should be hesitant to attribute a sinister or ulterior motive to the corporation unless such a factual situation clearly appears. The law contemplates that any legitimate business may grow if legitimate means be employed.

In these proceedings, the evidence is convincing that the officers and directors of the petitioners were honest in their determination of the need to accumulate earnings rather than to distribute them. They have shown that, in their opinion, there were various reasons which prompted their action. The exact amount that would be needed for the several contingencies which confronted them could not be foretold with certainty, but clearly their actions were not based on any ulterior motive, and I can not say that my judgment is better than theirs as to the amount that would be needed in the business. Moreover, we find here actual expenditures by the petitioners of substantial amounts for the protection and furtherance of their businesses as the needs arose and as equipment became available.

I think the petitioners should prevail.

JOHNSON, *J.*, agrees with this dissent.