THE FACTORIES INVESTMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93273. Filed March 19, 1963.

*Benjamin Nadel, C.P.A.*, and *Norman Nadel, Esq.*, for the petitioner.

*Lawrence A. Wright, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in the income tax of the petitioner corporation for each of its fiscal years ended June 30, 1958 and 1959, in the respective amounts of $6,432.05 and $6,474.52. The sole issue is whether petitioner was availed of during said fiscal years for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed. If the petitioner was so availed of, then the respondent was justified in his imposition of the accumulated earnings tax under section 531 of the 1954 Code, which action gave rise to the entire amounts of the deficiencies involved.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts, together with the exhibits therein identified, is incorporated herein by reference.

The petitioner corporation, the Factories Investment Corp., was organized in 1936 under the laws of the State of Connecticut. At all times material it has kept its books of account and filed its Federal income tax returns on an accrual basis of accounting, for fiscal years ended June 30. For the taxable fiscal years 1958 and 1959, which are here involved, it filed Federal corporation income tax returns with the district director of internal revenue at Hartford, Conn.

Commencing in 1949 and continuing throughout the taxable years, the capital stock of the petitioner corporation, as well as of two other corporations (hereinafter more particularly described), Princeton Knitting Mills, Inc., and Hamilton & Main, Inc., was owned principally by Max Doft and Harry Fleisher and members of their

families. During said period the stock of the petitioner was owned, two-thirds by Max Doft and one-third by Harry Fleisher, while that of Princeton Knitting Mills (hereinafter called Princeton), was owned, two-thirds by Max Doft and members of his family, and one-third by Harry Fleisher and the members of his family—except for approximately 5 percent of the common stock in Princeton, which was owned by key executive employees of that corporation. The stock of Hamilton & Main was owned, 50 percent by the Dofts and 50 percent by the Fleishers.

Princeton was organized in 1932; and at all times since its organization, it has engaged in the business of manufacturing knitted fabrics. In 1936, its plant and equipment were mortgaged; and the mortgagee was threatening to institute foreclosure proceedings with respect thereto. Doft and Fleisher and another individual who was then a Princeton stockholder, thereupon caused petitioner to be organized for the purpose of purchasing the mortgagee's interest. The purchase was made; and in due course, Princeton paid off its mortgage indebtedness to petitioner.

Apparently until 1944, Princeton conducted its operations in Watertown, Conn. In that year, it was desirous of enlarging its operations, and for that purpose required additional space. Petitioner in 1944 purchased a rather dilapidated piece of industrial property, called the Mill Street building, in Waterbury, Conn., which it promptly leased to Princeton at an annual rental of $35,000. Petitioner paid $60,862.80 for said land and building on Mill Street. Extensive renovations were required to make the Mill Street building suitable for Princeton's needs; and that corporation, the lessee, made such renovations and improvements to the leasehold with its own funds. During the taxable years involved about 60 percent of Princeton's output was manufactured in the Mill Street building.

From and after petitioner's acquisition and lease of the Mill Street building to Princeton, the former's principal business activity has been the leasing of said building to Princeton. Petitioner also expended $7,000 in 1940, and approximately $47,500 in 1949, for the purchase of knitting machinery, which it has also leased to Princeton. In 1953, petitioner expended approximately $28,400 in enlarging the Mill Street building; and for 1954 and subsequent years, the rental which it received from Princeton for use and possession of said building was increased to $40,000 per year.

The following condensed comparative balance sheets show the financial position of the petitioner, as of June 30, for the years 1955 through 1959:

*Comparative balance sheets*

| | Fiscal years ended June 30— | | | | |
|---|---|---|---|---|---|
| | 1955 | 1956 | 1957 | 1958 | 1959 |
| **ASSETS** | | | | | |
| Cash | $33,787.85 | $62,408.40 | $212,678.17 | $243,125.21 | $273,826.71 |
| Notes and accounts receivable | 121,160.00 | 125,960.00 | | | |
| Other investments | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Fixed assets (less accumulated depreciation) | 82,229.55 | 76,258.93 | 70,288.31 | 64,317.69 | 58,347.07 |
| Land | 12,551.36 | 12,551.36 | 12,551.36 | 12,551.36 | 12,551.36 |
| Prepaid expenses | 4,741.53 | 718.04 | 4,465.75 | 3,887.76 | 4,180.77 |
| Treasury stock | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 |
| Organization expense | 94.69 | 94.69 | 94.69 | 94.69 | 94.69 |
| Total assets | 261,364.98 | 284,791.42 | 306,878.28 | 331,376.71 | 355,800.60 |
| **LIABILITIES AND CAPITAL** | | | | | |
| Accounts payable | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 3,046.00 |
| Accrued expenses | 150.24 | 150.24 | 150.24 | 155.66 | 310.47 |
| Reserve for taxes | 13,697.87 | 14,525.98 | 14,173.89 | 15,277.64 | 15,457.01 |
| Common capital stock | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Earned surplus | 244,016.87 | 266,615.20 | 289,054.15 | 312,443.41 | 335,987.12 |
| Total liabilities and capital | 261,364.98 | 284,791.42 | 306,878.28 | 331,376.71 | 355,800.60 |

The following condensed comparative income statements show the results of petitioner's operations for its fiscal years 1955 through 1959:

*Comparative statements of profit and loss*

| | Fiscal years ended June 30 | | | | |
|---|---|---|---|---|---|
| | 1955 | 1956 | 1957 | 1958 | 1959 |
| Rent income | $46,000.00 | $46,000.00 | $46,000.00 | $46,000.00 | $46,000.00 |
| Expenses: | | | | | |
| Property taxes | 7,102.61 | 7,378.92 | 7,786.80 | 7,953.66 | 8,055.63 |
| Depreciation | 5,970.62 | 5,970.62 | 5,970.62 | 5,970.62 | 5,970.62 |
| Other expenses | 519.79 | 522.81 | 539.19 | 557.71 | 886.37 |
| Total expenses | 13,593.02 | 13,872.35 | 14,296.61 | 14,481.99 | 14,912.62 |
| Profit from rents | 32,406.98 | 32,127.65 | 31,703.39 | 31,518.01 | 31,087.38 |
| Interest income | 3,319.99 | 4,996.66 | 4,909.45 | 7,148.89 | 7,913.34 |
| Total income | 35,726.97 | 37,124.31 | 36,612.84 | 38,666.90 | 39,000.72 |
| Provision for taxes on income | 13,697.87 | 14,525.98 | 14,173.89 | 15,277.64 | 15,457.01 |
| Net profit after taxes | 22,029.10 | 22,598.33 | 22,438.95 | 23,389.26 | 23,543.71 |

Petitioner has never declared or paid a dividend from the time of its organization in 1936, to and including June 30, 1959, the close of the last taxable year here involved.

The following table shows petitioner's cash in bank at the several dates shown:

| | | | |
|---|---|---|---|
| July 31, 1957 | $16,503.50 | July 31, 1958 | $17,553.12 |
| Aug. 31, 1957 | 20,336.83 | Aug. 31, 1958 | 21,386.45 |
| Sept. 30, 1957 | 16,271.29 | Sept. 30, 1958 | 16,882.16 |
| Oct. 31, 1957 | 20,104.62 | Oct. 31, 1958 | 20,565.25 |
| Nov. 30, 1957 | 23,937.95 | Nov. 30, 1958 | 24,398.58 |
| Dec. 31, 1957 | 224,768.24 | Dec. 31, 1958 | 255,116.23 |
| Jan. 31, 1958 | 13,589.57 | Jan. 31, 1959 | 18,949.56 |
| Feb. 28, 1958 | 17,414.90 | Feb. 28, 1959 | 22,774.89 |
| Mar. 31, 1958 | 21,248.27 | Mar. 31, 1959 | 26,608.26 |
| Apr. 30, 1958 | 25,081.60 | Apr. 30, 1959 | 30,441.59 |
| May 31, 1958 | 21,165.21 | May 31, 1959 | 25,913.38 |
| June 30, 1958 | 243,725.21 | June 30, 1959 | 273,826.71 |

Commencing in August 1951, petitioner periodically made cash loans, at interest, to Princeton. These loans were repaid from time to time, and new loans were made shortly after each repayment. The following table sets forth with respect to said loans (1) the dates thereof; (2) the amounts thereof; and (3) the repayment dates:

| Date loan made | Amount | Date repaid |
|---|---|---|
| Aug. 9, 1951 | $80,000 | Dec. 15, 1952 |
| Aug. 27, 1953 | 120,000 | Dec. 16, 1953 ($40,000) |
| | | Dec. 31, 1953 ($80,000) |
| Feb. 9, 1954 | 90,000 | June 28, 1954 |
| July 20, 1954 | 100,000 | Dec. 29, 1954 |
| Jan. 13, 1955 | 120,000 | Apr. 6, 1955 |
| Apr. 23, 1956 | 40,000 | June 22, 1956 |
| July 11, 1956 | 50,000 | Dec. 26, 1956 |
| Sept. 26, 1956 | 80,000 | Dec. 26, 1956 |
| Jan. 31, 1957 | 190,000 | June 21, 1957 |
| July 5, 1957 | 200,000 | Dec. 17, 1957 |
| Jan. 10, 1958 | 215,000 | June 19, 1958 |
| July 21, 1958 | 230,000 | Dec. 29, 1958 |
| Jan. 16, 1959 | 240,000 | June 19, 1959 |
| July 9, 1959 | 260,000 | Dec. 18, 1959 |

As of June 30 and December 31 of each year, Princeton furnished financial statements to certain of its creditors and suppliers. Princeton's custom was to repay the loans to petitioner just prior to said statement dates and to make new loans shortly after such dates.

During 1957 and the years following, Princeton expanded its business by adding a new product, simulated fur; and it expended approximately $1,143,000 for the purchase of new machinery and equipment and increased its investment in merchandise inventory from $2,574,690 at June 30, 1957, to $4,848,734 at June 30, 1959.

The following condensed comparative balance sheets show the financial position of Princeton, at June 30, for the years 1955 through 1959:

| | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash | $118,349.31 | $113,562.61 | $176,318.92 | $191,464.87 | $199,112.36 |
| Accounts receivable | 2,036,900.60 | 944,188.74 | 894,024.20 | 669,520.37 | 1,052,042.23 |
| Cash value of life insurance | 89,490.15 | 101,963.89 | 115,304.87 | 130,295.46 | 108,586.50 |
| Inventories | 1,870,649.54 | 2,558,946.34 | 2,574,690.08 | 3,222,726.44 | 4,848,734.12 |
| Total current assets | 4,115,389.60 | 3,718,661.58 | 3,760,338.07 | 4,214,007.14 | 6,208,475.21 |
| Land, buildings, and equipment | 3,219,034.46 | 3,462,813.75 | 3,762,565.47 | 4,114,024.38 | 4,566,209.38 |
| Reserve for depreciation | 1,410,352.54 | 1,645,955.88 | 1,896,697.30 | 2,194,097.10 | 2,371,117.68 |
| Depreciated value | 1,808,681.92 | 1,816,857.87 | 1,865,868.17 | 1,919,927.28 | 2,195,091.70 |
| Equipment under construction | 683.66 | 13,093.81 | 31,034.38 | 12,003.13 | 29,009.28 |
| Prepaid expenses, etc | 96,327.08 | 79,801.26 | 82,796.67 | 74,159.02 | 84,987.11 |
| Total fixed assets | 1,905,692.66 | 1,909,752.94 | 1,979,699.22 | 2,006,089.43 | 2,309,088.09 |
| Total assets | 6,021,082.26 | 5,628,414.52 | 5,740,037.29 | 6,220,096.57 | 8,517,563.30 |
| **LIABILITIES** | | | | | |
| Accrued labor and expenses | 154,370.30 | 164,178.46 | 179,774.16 | 223,330.25 | 325,220.52 |
| Accounts payable | 882,497.98 | 905,566.55 | 939,560.57 | 1,307,119.03 | 1,692,653.68 |
| Due to Commercial Factors Corp | | | | | [1] 932,451.58 |
| Deposits payable | 21,271.50 | 31,447.20 | 49,121.06 | 32,332.58 | 33,436.33 |
| Taxes payable | 488,845.87 | 102,317.31 | 157,387.96 | 182,503.03 | 631,584.89 |
| Total current liabilities | 1,546,985.65 | 1,203,509.52 | 1,325,843.75 | 1,745,284.89 | 3,615,347.00 |
| Net worth | [2] 4,474,096.61 | 4,424,905.00 | 4,414,193.54 | 4,474,811.68 | 4,902,216.30 |

[1] Cash advances received from the factor in excess of accounts receivable sold to the factor.
[2] Before charge to surplus for $200,000—as a reserve for contingencies for flood loss in Connecticut, August 1955.

The following condensed comparative income statements show the results of Princeton's operations for each of its fiscal years ended June 30, 1955 through 1959:

| | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| Sales | $14,649,800.66 | $15,275,832.72 | $14,454,373.09 | $14,502,384.85 | $17,262,249.49 |
| Cost of goods sold | 12,752,990.97 | 13,837,802.22 | 12,892,376.78 | 12,780,578.88 | 14,478,163.14 |
| Gross profit on sales | 1,896,809.69 | 1,438,030.50 | 1,561,996.31 | 1,721,805.97 | 2,784,086.35 |
| Selling and administrative expenses | 1,091,620.49 | 1,308,170.50 | 1,460,620.29 | 1,579,865.43 | 1,821,434.48 |
| Operating profit | 805,189.20 | 129,860.00 | 101,376.02 | 141,940.54 | 962,651.87 |
| Other income | 41,725.19 | 78,612.85 | 29,609.06 | 50,071.56 | 25,711.37 |
| Other charges | 50,344.71 | 5,219.32 | 35,108.09 | 6,323.16 | 34,484.42 |
| Net profit | 796,569.68 | 203,253.53 | 95,876.99 | 185,688.94 | 953,878.82 |
| Provision for taxes on income | 409,513.03 | 14,628.95 | 20,761.48 | 79,908.12 | 488,935.82 |
| Net profit after taxes | 387,056.65 | 188,624.58 | 75,115.51 | 105,780.82 | 464,943.00 |

In addition to the above-mentioned loans by petitioner to Princeton, petitioner in April 1955 also made a loan of $120,000 to the above-mentioned corporation, Hamilton & Main, to enable the latter to purchase a parcel of improved real estate known as the Bank Street building. Hamilton & Main thereupon leased the Bank Street building to Princeton, for the latter's use as a warehouse. Petitioner's loan to Hamilton & Main bore interest at the rate of 4 percent per annum;

and it was repaid to petitioner by Hamilton & Main in three installments as follows:

| | |
|---|---|
| Sept. 27, 1956 | $80, 000 |
| Nov. 14, 1956 | 25, 000 |
| Dec. 26, 1956 | 15, 000 |
| Total | 120, 000 |

As above found as a fact, petitioner never paid a dividend during the 23 years of its existence from 1936 to 1959. However, Princeton paid dividends to its shareholders in the following amounts for the fiscal years shown:

| Fiscal year ended June 30— | Preferred stock | Common stock | Total |
|---|---|---|---|
| 1955 | $12, 862 | $34, 920 | $47, 782 |
| 1956 | 10, 476 | 34, 920 | 45, 396 |
| 1957 | 10, 476 | 34, 920 | 45, 396 |
| 1958 | 10, 476 | 34, 920 | 45, 396 |
| 1959 | 10, 476 | 34, 920 | 45, 396 |

And in each of the years 1948 through 1955, Hamilton & Main paid dividends to its shareholders in the amount of $22,500.

The cash requirements of the petitioner for the operation of its business amounted to about $24,000 per year. Such amount was principally required for the payment of Federal income taxes and State and local property and income taxes. Relatively minor amounts (between $500 and $800) were required each year to defray the cost of insurance on its properties and for legal and professional services rendered to the petitioner. Petitioner paid no salary or other compensation to its officers, in either of the taxable years involved.

Petitioner's net income, after Federal income taxes, for its fiscal years 1958 and 1959 was $23,389.26 and $23,543.71, respectively.

Commencing on January 1, 1960, petitioner leased the Mill Street building to a subsidiary of a corporation known as Burlington Industries,[1] at an annual rental of $80,000. Subsequently, in August 1960, petitioner sold the Mill Street building to Hamilton & Main for $250,000; and shortly thereafter, petitioner corporation was dissolved, and its assets distributed in liquidation to its stockholders.

For the calendar years 1958 and 1959, Max Doft and his spouse reported taxable income on their Federal income tax returns, and paid taxes thereon, in the following amounts:

| | 1958 | 1959 |
|---|---|---|
| Taxable income reported | $131, 954. 95 | $139, 849. 04 |
| Taxes paid thereon | 71, 707. 78 | 77, 200. 56 |

[1] The stockholders of Princeton "sold the business" to Burlington Industries on or about December 31, 1959.

If the Dofts' taxable income for each such year were increased by two-thirds of the petitioner's net income after taxes, for its fiscal years 1958 and 1959, the Federal income tax liabilities of the Dofts would have been increased as shown in the following computation:

| | 1958 | 1959 |
|---|---|---|
| Taxable income reported | $131,954.95 | $130,849.04 |
| Share (⅔) of income of petitioner corporation | 15,593.11 | 15,695.81 |
| Total income | 147,548.06 | 155,544.85 |
| Taxes on total amounts of income | 83,060.86 | 88,730.58 |
| Taxes actually paid | 71,707.78 | 77,200.56 |
| Increase in tax liabilities | 11,353.08 | 11,530.02 |

For the calendar years 1958 and 1959, Harry Fleisher and his spouse reported taxable income in their Federal income tax returns, and paid taxes thereon, in the following amounts:

| | 1958 | 1959 |
|---|---|---|
| Taxable income reported | $65,287.82 | $74,663.78 |
| Taxes paid thereon | 29,130.86 | 35,348.22 |

If the Fleishers' taxable income for each such year were increased by one-third of petitioner's net income after taxes, for its fiscal years 1958 and 1959, the Federal income tax liabilities of the Fleishers would have been increased as shown in the following computation:

| | 1958 | 1959 |
|---|---|---|
| Taxable income reported | $65,287.82 | $74,663.78 |
| Share (⅓) of income of petitioner corporation | 7,796.55 | 7,847.90 |
| Total income | 73,084.37 | 82,511.68 |
| Taxes on total amount of income | 33,807.52 | 40,276.71 |
| Taxes actually paid | 29,130.86 | 35,348.22 |
| Increase in tax liabilities | 4,676.66 | 4,928.49 |

On August 17, 1960, respondent, acting pursuant to the provisions of section 534(b) of the 1954 Code, sent a notification to the petitioner by certified mail, wherein it was stated that he proposed to issue a statutory notice of deficiency for the taxable years ended June 30, 1958 and 1959, which would include an amount with respect to the accumulated earnings tax imposed by section 531 of the 1954 Code.

Thereafter on October 11, 1960, the petitioner, acting pursuant to section 534 of the 1954 Code, submitted a "statement" (incorporated herein by reference) to the respondent, wherein it set forth "the grounds (together with facts sufficient to show the basis thereof) on

which" it relied "to establish that all or any part of the earnings and profits * * * [had] not been permitted to accumulate beyond the reasonable needs of the business."

### ULTIMATE FINDINGS OF FACT.

During each of the taxable years involved, the petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business.

Petitioner was availed of during each of the taxable years involved for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed.

### OPINION.

Section 534 of the 1954 Code provides in substance that where the Commissioner notifies a taxpayer corporation of his intention to issue a notice of deficiency predicated in whole or in part upon an allegation that the earnings and profits of the taxpayer have been permited to accumulate beyond the reasonable needs of its business, and where the taxpayer submits to the Commissioner "a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business," then the burden of proof shall be on the Commissioner, with respect to the grounds set forth in the taxpayer's statement. See sec. 534(a)(2). In the instant case, the respondent issued such a notice and the petitioner filed its statement in response thereto. We are satisfied, after a careful reading of petitioner's "statement," that it sufficed to shift the burden of proof to the respondent, to the extent provided by section 534 (a)(2) and (c).

The section 534 statement which petitioner filed with respondent contains two grounds upon which it relies to establish that its earnings and profits had not been permitted to accumulate beyond the needs of the business. These grounds may be summarized as follows:

(1) Petitioner and Princeton were units in a single business enterprise, with petitioner furnishing space for carrying on manufacturing, and with Princeton actually carrying on manufacturing activities. By reason of Princeton's addition of the new line of products (simulated fur), that corporation's working capital was depleted by its outlays for new equipment; and it was necessary for petitioner to use its earnings and profits, by way of loans to Princeton, to supply Princeton's needs for working capital.

(2) Petitioner was compelled to make loans to Princeton, its only tenant and its only source of income, in order to enable that corporation to modernize its equipment, so that Princeton could remain in

the Waterbury area and remain a tenant of petitioner. Stated another way, loans by petitioner to Princeton were necessary, as a device to retain for petitioner its only customer and sole source of revenue.

With respect to the first of the foregoing grounds, the evidence establishes that petitioner corporation did not own any of the capital stock of Princeton, nor did that corporation own any of the stock in petitioner. Actually, as the findings show, the stock of each of the two corporations was owned by substantially the same individuals. If we assume, for the sake of argument, that Princeton did require additional working capital, the question arises whether petitioner was justified in accumulating its earnings and profits in order to supply Princeton's assumed needs. Respondent urges that retaining earnings and profits for such a purpose does not suffice to render petitioner immune to the charge that it was accumulating earnings beyond the reasonable needs of its business.

We think that the respondent is correct; and we find clear and persuasive support for respondent's position in the case of *Latchis Theatres of Keene, Inc.*, 19 T.C. 1054, affd. 214 F. 2d. 834 (C.A.1, 1954). In the *Latchis* case, members of the Latchis family were the owners of the stock of several corporations, with none of the corporations in the Latchis group owning stock of any other corporation in the group. The taxpayers in that case, two of the corporations in the Latchis group, argued that they should be permitted to retain their earnings, in order to aid other corporations in the group. We held such argument to be unavailing; and stated in part as follows:

It must be borne in mind that each petitioner can escape the Commissioner's determination only if it shows that its accumulations for 1946 were reasonably needed in *its* business. The fact that they might have been needed or that they were actually used in the business of some other entity is wholly immaterial unless it is shown that such needs or use were in fact reasonably necessary to the business of the petitioner. Cf. *Stanton Corporation*, 44 B.T.A. 56, 80, affd. per curiam 138 F. 2d 512. * * * The Latchis family could have put all of their properties in one corporation and operated all of their businesses through that corporation. Then the arguments they make here that the earnings of one activity can be retained to aid or develop another phase of the business would have more force. But they chose; instead, to divide their holdings and business activities among a number of separate corporations in order to limit liabilities and perhaps to obtain other benefits. They must be judged by what they did in this respect rather than by what they might have done. *Attention must be focused upon the petitioners.* The accumulation of the 1946 earnings of the petitioners, on top of the earnings and capital which they already had, can not be justified by various needs and purposes of other interests of the Latchis family businesses.

\*          \*          \*          \*          \*          \*          \*

The Latchis family could as well serve the interests of their other corporations and of their over-all business holdings and activities by distributing the earnings of the petitioners to their stockholders so that those individuals could use those funds in their other activities in any way that they desired. Cf.

*Stanton Corporation, supra*; *Helvering* v. *National Grocery Co.*, 304 U.S. 282. The only disadvantage that this record shows in such a procedure is that it would have subjected the stockholders to additional taxes, the very result which section 102 was designed to promote. *Helvering* v. *Chicago Stock Yards Co.*, 318 U.S. 693. * * * [Emphasis supplied.]

To the same effect as the Court's holding in the *Latchis* case, is the respondent's regulation issued under section 537 of the 1954 Code (dealing with "Reasonable Needs of the Business"). In section 1.537–2(c)(3), Income Tax Regs., it is provided:

(c) *Unreasonable accumulations of earnings and profits.* Although the following purposes are not exclusive, accumulations of earnings and profits to meet any one of such objectives may indicate that the earnings and profits of a corporation are being accumulated beyond the reasonable needs of the business:

\* \* \* \* \* \* \*

(3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations;

The business of Princeton, manufacturing knitted fabrics and simulated fur, can not, in our opinion, be considered to be the business of the petitioner, a separate corporate entity, which was engaged only in leasing the Mill Street building and certain equipment therein.

Applying the principles embodied in the *Latchis* case, in the cases therein cited, and in the above-cited regulation, to the facts shown by the record bearing upon the ownership and business activities of Princeton and of petitioner, it is clear to us that petitioner's first ground for accumulating its earnings rather than distributing them is, as a matter of law, not a valid and sufficient one.

Coming to the second ground urged by the petitioner in its section 534 statement—that petitioner was required to lend funds to Princeton to enable that corporation to remain in business in Waterbury and continue as petitioner's sole tenant and its sole source of income— it appears that petitioner is trying to bring itself within the respondent's regulation (sec. 1.537–2(b)(5), Income Tax Regs.) which states:

(b) *Reasonable accumulation of earnings and profits.* Although the following grounds are not exclusive, one or more of such grounds, if supported by sufficient facts, may indicate that the earnings and profits of a corporation are being accumulated for the reasonable needs of the business * * *:

\* \* \* \* \* \* \*

(5) To provide for investments or loans to suppliers or customers if necessary in order to maintain the business of the corporation.

The evidence establishes, to our satisfaction: (1) That Princeton did not require loans from petitioner in order to stay in the Water-

bury area; and (2) that, even if Princeton had left the Waterbury area, petitioner could have found another tenant equally satisfactory.

Princeton was a successful company that earned sizable profits, after taxes, in both taxable years here involved ($105,780.02 in fiscal 1958, and $464,943 in fiscal 1959) as well as for the previous 3 years. Moreover, Princeton paid dividends on both its preferred and common stock in all 5 of such years, totaling almost $50,000 in each year. Its balance sheets (reflected in summary form in our Findings of Fact) show that it enjoyed a ratio of current assets to current liabilities of over 2 to 1 and of over 1.5 to 1, at the end of its fiscal years 1958 and 1959, respectively, and that it had more than $190,000 of cash at each such date. We are fully satisfied that petitioner was not required, at the risk of losing its only customer, to lend Princeton funds, for that corporation appears to us to have been in a healthy financial condition.[2] To be sure, Princeton had been in straitened financial circumstances in 1936; but as its balance sheets and income statements (summarized in our Findings of Fact) show, it had long since recovered its financial health.

Even if we assume that Princeton did require funds from petitioner, such loans as would have been required could easily have been made out of petitioner's accumulated earnings and profits of $289,054.15, as they existed at July 1, 1957, the beginning of the taxable years here involved. It must be remembered that the accumulated earnings tax here sought to be imposed by respondent is upon the earnings of only 2 years of the petitioner, fiscal 1958 and fiscal 1959. The evidence convinces us that petitioner's earnings of such years were not required for loans to Princeton.

Nor was Princeton the only possible tenant for petitioner. In 1960, after "the business" of Princeton had been sold, petitioner leased the Mill Street building to another manufacturer at an annual rental of $80,000, which was twice the amount of the highest rental ever paid by Princeton.

We conclude that respondent has carried his burden of proof to show that petitioner was not required to accumulate its earnings and profits for the reasons embraced in its second ground.

The two grounds asserted by petitioner in its section 534 statement having been shown, for the reasons above stated in our discussion of said grounds, to be unavailing, and no new or different grounds having been pleaded or argued by petitioner, the result is that petitioner must

---

[2] In this connection, the following testimony given on cross-examination at the trial herein, by Max Doft, president of both petitioner and of Princeton, is illuminating:

"Q. Mr. Doft, Princeton Knitting Mills had established credit from other sources, however?

"A. From the bank, from their factors."

be found to have accumulated earnings and profits beyond the reasonable needs of its business. When such is the fact, section 533(a) provides that it "shall be determinative of the purpose to avoid the income tax with respect to its shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Petitioner has not produced any such preponderance of the evidence. Rather the evidence leads to the conclusion that such accumulation was for the proscribed purpose.

Petitioner had been in existence for over 21 years at the beginning of the taxable years involved. As hereinbefore found as a fact, by the beginning of such taxable years, it had accumulated earnings and profits of over $289,000. It had profits in each of such years, but it did not distribute any of such profits to its two shareholders, Doft and Fleisher. Indeed it never declared or paid a dividend from the time of its organization to and including the end of fiscal 1959, the last taxable year here involved. Nor did it even pay its officers a salary in either of said years. Petitioner had cash on hand at June 30, 1958 and 1959, in the respective amounts of $243,125.21 and $273,826.71. Petitioner's needs for funds for use in its own operations were, as shown by the findings, modest. And, if its earnings and profits of the 2 years had been distributed as dividends to its stockholders, the income tax liabilities of those individuals would have been materially increased, as is also shown in our Findings of Fact.

Based upon a consideration and weighing of all the evidence, we have hereinabove found as an ultimate fact, and we here hold, that petitioner was availed of during the taxable years for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Wherefore, we decide the case for the respondent.

*Decision will be entered for the respondent.*