31 WEST 53rd STREET CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
31 West 53rd Street Corp. v. Commissioner
Docket No. 2847-71
United States Tax Court
T.C. Memo 1974-32; 1974 Tax Ct. Memo LEXIS 286; 33 T.C.M. (CCH) 142; T.C.M. (RIA) 74032; February 4, 1974, Filed. Alexander J. D. Greeley, for the petitioner.
Fred L. Baker, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION
TANNENWALD, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1966 and 1967 in the respective amounts of $3,000.88 and $2,123.63. The only issue is whether the petitioner is liable for the accumulated earnings tax for those years. 2 FINDINGS OF FACT
Some of the facts have been stipulated and, together with the stipulated exhibits, are incorporated herein by this reference.
Petitioner is a New York corporation whose principal place of business at the time *288 it filed the petition herein was 31 West 53rd Street, New York, New York. Petitioner filed Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue, New York, New York. Petitioner's president and sole shareholder was Henry I. Strauss (Strauss). He was also the president and controlling shareholder of Henry Strauss Productions, Inc., Henry Strauss & Company, Henry Strauss Distributing Corp., Henry Strauss Training Corp., and Pat Studios, Inc.
Henry Strauss Productions, Inc. (Productions) was engaged in the business of producing motion pictures sponsored by clients such as businesses, schools, and government agencies. Henry Strauss & Company was engaged in the business of producing slide films and educational materials involving the use of the films. Henry Strauss Distributing Corp. was engaged in the business of distributing the products of the other two companies. 3 On June 10, 1955, petitioner purchased the lot and five-story brownstone office building located at 31 West 53rd Street, New York City. Upon such purchase, Productions, Henry Strauss & Company, and Henry Strauss Distributing Corp. leased their business *289 premises therein from petitioner under successive five-year leases. In April 1966, Henry Strauss Training Corp. also began to lease premises in the building and engaged in the business of conducting management development programs and personnel training courses for the employees of its clients.
The primary considerations leading to the purchase of the 31 West 53rd Street building were its convenient location in relation to the clients of the tenant companies and a size and privacy conducive to the interaction of their employees. The building proved to be unsatisfactory, however, for any operations requiring the use of sound recording equipment because the subway running beneath the building caused a noise problem. The building was also inadequate for purposes of constructing a large movie studio, such as those used by Productions in producing its motion pictures.
During the late 1950's and early 1960's, the use of large movie studios was an essential requirement of 4 Productions' business. Productions regularly rented on a daily basis the use of such studios as were available in the vicinity of New York City. Such studios were in short supply during the period mentioned and *290 would often be unavailable unless reserved two or three months in advance. Productions would sometimes be able on shorter notice to rent a studio owned by one of its competitors but this practice created obvious difficulties for Productions in its relations with its clients. On occasion, Productions was able to obtain only a studio larger than it really needed. Furthermore, the locations of the studios that Productions was able to rent were often inconvenient for the company's clients.
In hopes of remedying these difficulties, Strauss and other key employees of Productions made some preliminary efforts, beginning about the time petitioner purchased its building, to find an existing movie studio that could be leased on a long-term basis or purchased or a suitable building, such as an old theater, that could be purchased or leased and converted into a movie studio. Whenever Productions rented a studio that seemed to be satisfactory for its needs, inquiries were made as to whether the 5 studio was available for lease or purchase. These efforts never progressed to the point of serious negotiations, however, because of inability or unwillingness to pay the prices asked. During *291 the early 1960's, existing studios in New York City and buildings suitable for conversion into studios were in great demand for television purposes and the resulting offering prices of acceptable premises became even more prohibitive.
During the early 1960's, improvements in photographic and sound recording equipment permitted more motion pictures to be made on location rather than in movie studios. Productions became a leader in the production of movies on location and its need to rent movie studios decreased accordingly. By 1966 and 1967, the use of large movie studios was no longer an important requirement of Productions' business.
During 1966 and 1967, the cost of purchasing a building in the New York City vicinity suitable for conversion to a movie studio would have been 6 at least $150,000. In addition, at least $100,000 would have been needed to install the necessary electrical facilities, air conditioning, and soundproofing in the studio and at least another $100,000 would have been required to purchase the necessary lighting and camera equipment.
Pat Studios, Inc. (Pat), began to lease space in petitioner's building in May 1964. Pat was organized to build and operate *292 a movie studio in petitioner's building. This was a small, special-purpose studio that was inadequate in size and facilities for the work done by Productions. It was designed to accomodate new developments in the businesses of Henry Strauss & Company and Henry Strauss Training Corp. The former company used Pat's studio to produce film "case histories" and other training films calling for the use of a small studio. The latter company used the studio as a seminar room for its training courses, which sometimes required the use of movie equipment. The cost of building and operating the studio turned out to be higher than expected, and the studio proved to be less than satisfactory because of the noise problem previously referred to. Pat was unprofitable during its years of operation and was dissolved in 1966. 7 During the years in issue, petitioner had no tenants other than the previously mentioned related corporations.
Petitioner's balance sheet as of December 31, 1966 and 1967 reveals the following: 8 ASSETS:
12/31/66
12/31/67 Cash
$ 25,097
$ 41,233
Marketable Securities (Cost)
72,239
71,480
Total Quick Assets
$ 97,336
$112,713
Accounts and Notes Receivable (Net)
4,061
5,419
Mortgage Receivable (Demand)
13,200
13,200
Notes Receivable
10,000
10,000
Total Current Assets
$124,597
$141,332
Fixed Assets (Net)
41,425
35,251
Land
30,000
30,000
Other Assets
243
200
Total Assets
$196,265
$206,783
LIABILITIES and NET WORTH:
Mortgage Payable (Demand)
$ 35,000
$ 35,000
Current Liabilities
7,845
5,634
Total Current Liabilities
$ 42,845
$ 40,634
Capital Stock
5,000
5,000
Earned Surplus
148,420
161,149
Total Liabilities and Net Worth
$196,265
$206,783
*293 9 Petitioner had net income after taxes of $12,917 [1] in 1966 and $10,803 in 1967. Its accumulated earnings and profits were as follows as of December 31 of the year indicated: 1965
$133,889
1966
148,420
1967
161,149
Petitioner paid no dividends during 1966 and 1967. Its only previous dividend was a $1,000 payment to Strauss in 1964.
The accumulated earnings and profits of petitioner's lessees at December 31, 1966 [2] were as follows: Henry Strauss Productions, Inc.
$203,381
Henry Strauss & Company
159,035
Henry Strauss Distributing Corp.
128,845
Henry Strauss Training Corp.
129,830
Pat Studios, Inc. (dissolved)
(deficit) 10 Strauss and his wife filed joint Federal income tax returns for the years 1966 and 1967. They reported taxable income and paid Federal income tax in the following amounts: 1966
1967 Taxable income
$67,777
$67,939
Federal income tax
26,491
26,490
*294 On September 30, 1970, respondent notified petitioner by certified mail pursuant to section 534(b) [3] that he proposed to issue a notice of deficiency in regard to petitioner's taxable years 1966 and 1967, setting forth amounts with respect to the accumulated earnings tax imposed by section 531.
On November 23, 1970, petitioner submitted to respondent the following statement purportedly in compliance with section 534(c):
Taxpayer should not be subject to a penalty tax under section 531 inasmuch as taxpayer had a business reason for accumulation of earnings in excess of 10,000 [sic ].
ULTIMATE FINDINGS OF FACT
1. Petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its 11 business during 1966 and 1967.
2. Petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its sole shareholder by permitting its earnings and profits to accumulate instead of being divided or distributed during 1966 and 1967.
OPINION
The only issue for decision is whether petitioner is liable for the *295 accumulated earnings tax for 1966 and 1967. [4] Respondent asserts that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business. Petitioner offers two alleged needs of its business to justify its accumulation of earnings: (1) the need to purchase and equip a large movie studio and (2) the need to replace its building in the future. 12 We think that the preponderance of the evidence *296 herein establishes that neither of these needs (or, for that matter, any other present or reasonably anticipated needs) existed during the taxable years in question. Under such circumstances, the location of the burden of proof is immaterial, although we are constrained to note that the bare assertion of need contained in the statement submitted by petitioner under section 534(c) did not satisfy the requirements of that section - it was nothing more than a conclusion masquerading as a reason. Wellman Operating Corporation, 33 T.C. 162, 183 -184 (1959); I.A. Dress Co., 32 T.C. 93, 100 (1959), affd. 273 F.2d 543 (C.A. 2, 1960); Dixie, Inc., 31 T.C. 415, 427 (1958), affd. 277 F.2d 526 (C.A. 2, 1960).[5]
The first ground cited by petitioner presents the question of the extent to which the needs of petitioner's *297 tenants, which were related corporations, 13 may be taken into account in determining the reasonable needs of petitioner's business. It is clear that the need for a large movie studio was essentially that of Productions and/or the other tenants and not that of petitioner's own business. Such a need on the part of one of the other Strauss companies is of itself no help to petitioner in this case. Factories Investment Corporation, 39 T.C. 908, 916-918 (1963), affd. 328 F.2d 781, 783-784 (C.A. 2, 1964); Latchis Theatres of Keene, Inc., 19 T.C. 1054, 1961, 1065 (1953), affd. 214 F.2d 834, 837 (C.A. 1, 1954). Conceivably, there may be circumstances where the reasonable business needs of a lessor corporation could be generated by the requirements of a present or potential tenant. However, where the tenants are related corporations, it would appear essential that evidence be presented which would show that there were sound reasons why the tenants were financially unable or otherwise unwilling to fill their own needs.Unless such a showing is made, each corporation would be able to rely on the needs of the others but limit consideration *298 of the source of satisfying those needs to its own resources. 14 The whipsaw situation thus created would be patently absurd. In the instant case, the evidence shows accumulated earnings of the other Strauss companies well in excess of the cost of new facilities without any indication of their lack of liquid assets to meet that cost. [6]
Moreover, we note that the idea that it might be advisable for Productions to obtain a large motion picture studio of its own was initiated by the production manager and other key technical personnel of that company. Once the idea was approved by Strauss, the primary responsibility for finding a suitable studio was not transferred to petitioner but was retained by those same employees *299 of Productions. Among the alternatives considered was the long-term lease of an existing movie studio from its present owner, and such a course would have left no role for petitioner as owner and lessor of the studio. Petitioner's corporate minutes, apparently complete in 15 all other respects, make no reference to any proposal for obtaining a movie studio. In short, the record herein affords no basis for any finding that a connection existed between Productions' onetime interest in having its own movie studio and petitioner's accumulation of earnings during the years in issue.
Even if we were to assume that a need to obtain a movie studio would have been a reasonable need of petitioner's business, as distinguished from a need of one of the other Strauss companies, the evidence indicates that no such need existed during the years in issue. At best, the record reveals a somewhat halfhearted interest of Productions during the late 1950's to obtain a studio of its own. Whatever steps were taken in this direction (which apparently amounted to no more than preliminary inquiries regarding cost and availability), they never progressed to the stage of serious negotiations or specific *300 construction plans sufficient to justify an accumulation of earnings. The early 1960's brought improvements in cameras and sound recording equipment that permitted more production on 16 location and lessened Productions' requirements for large indoor movie studios. Inflation in the price of existing studios and buildings suitable for conversion to studios, caused by competition from the television industry, further reduced Productions' interest. In sum, the preponderance of the evidence indicates that the proposal to obtain a studio, if not abandoned previously, was at best a remote possibility during the years in issue, and therefore provides no justification for petitioner's accumulation of earnings during those years.
As to the second ground cited by petitioner, i.e., the alleged need to replace the building on 53rd Street, it remains a bare allegation. The record contains no evidence that petitioner intended in 1966 and 1967 to replace its building any time within the foreseeable future. To the contrary, the evidence indicates that petitioner during the years in issue intended to continue leasing that building to the other Strauss companies and the latter companies shared *301 in that intention because of the building's excellent location for their purposes. 17 We conclude, as our ultimate findings of fact indicate, that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business during 1966 and 1967. [7] Section 533(a) provides that such a finding "shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Since petitioner has offered no evidence tending to negate the existence of the proscribed purpose, we hold that it is liable for the accumulated earnings tax for 1966 and 1967. In view of this holding, we need not consider respondent's further contention that, during the years in issue, petitioner was "a mere holding or investment company" within the meaning of section 533(b).
Decision will be entered for the respondent. Footnotes
1. Because of a mistake in addition, this item appears as $12,957 in the stipulation of facts submitted by the parties. ↩
2. The record contains no information on the earnings and profits of those corporations for 1967 or their current assets and liabilities during 1966 and 1967. ↩
3. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
4. Section 531 imposes the accumulated earnings tax on the accumulated taxable income of a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Section 533(a) provides that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." The term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Section 537(a) (1). ↩
5. R. Gsell & Co. v. Commissioner, 294 F.2d 321, 325 (C.A. 2, 1961), reversing on another ground 34 T.C. 41↩ (1960), relied upon by petitioner, makes pointed reference to a 24-page statement in which the taxpayer "showed its hand" and completely fails to support petitioner's position.
6. See Battelstein Investment Company v. United States, 302 F. Supp. 320 (S.D. Tex. 1969), affd. 442 F.2d 87 (C.A. 5, 1971), and Powder Mill Realty Trust, T.C. Memo. 1973-149↩, cases in which the taxpayers (lessor corporations comparable to petitioner herein) unsuccessfully cited, as grounds for their accumulation of earnings, alleged needs to acquire additional rental property to satisfy the needs of their related tenants. 7. Cf. Standard Corrugated Case Corp., T.C. Memo. 1973-276↩.