Robert R. Walker, Inc. v. Commissioner. Robert R. Walker and Wanda A. Walker v. Commissioner.
Robert R. Walker, Inc. v. Commissioner
Docket Nos. 4862-63, 4863-63.
United States Tax Court
T.C. Memo 1965-28; 1965 Tax Ct. Memo LEXIS 300; 24 T.C.M. (CCH) 140; T.C.M. (RIA) 65028; February 16, 1965
*300 Walker owned all the stock of a corporation which was a common carrier transporting automobiles for Studebaker under authority granted by the Interstate Commerce Commission. The corporation built and maintained a lake residence at which Walker entertained friends and Studebaker executives, the corporation paying practically all expenses. Walker and his family spent the winters in California, charging the corporation for part of the cost. Walker charged various expenses for travel or entertainment to the corporation. The corporation accumulated a large surplus and did not declare a dividend. It loaned large amounts of cash to Walker. Held: (1) The expenses of maintaining the lake residence were not business expenses of the corporation except to the extent allowed by respondent; (2) California expenses properly disallowed by respondent; (3) Allowable expenses for travel or entertainment determined; (4) The corporation was availed of in 1957 for the purpose of avoiding the income tax with respect to Walker by permitting earnings to accumulate; (5) Reasonable compensation for services of the secretary of the corporation determined; (6) The expenses disallowed to the corporation *301 represented constructive dividends to Walker. Merle H. Miller, 111 Monument Circle, Indianapolis, Ind., Alan H. Lobley, and Kenneth Foster, for the petitioners. Howard K. Schwartz, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax of the corporate and individual petitioners as follows: Robert R. Walker
Robert R. Walker,
and
Inc.
Calendar
Wanda A. Walker
Docket No. 4862-63
Year
Docket No. 4863-63
$31,635.83
1957
$15,071.66
1,707.16
1958
10,869.12
39,348.37
1959
10,823.88
16,664.64
1960
17,485.75
1961
8,052.11
*302 The cases were consolidated for trial and briefing. The issues remaining for decision in the case of the corporation are (1) whether certain expenses paid on account of the activities of its controlling stockholder were ordinary and necessary in its business; (2) whether the corporation was availed of in 1957 for the purpose of avoiding the income tax with respect to such stockholder by permitting earnings and profits to accumulate instead of being divided and distributed; and (3) whether the compensation paid Wanda A. Walker for services was reasonable. The year 1961 is in controversy only as it related to an operating loss to be carried back to prior years. The issue in the case of the individual petitioners is whether the expenses paid by the corporation for entertainment, travel, and club dues represent constructive dividends from the corporation. Adjustments for the years 1960 and 1961 with respect to medical expenses will depend upon the resolution of the foregoing issue. Some facts are stipulated. Findings of Fact The stipulation of facts and the exhibits thereto are incorporated herein by this reference. Robert R. Walker and Wanda A. Walker are husband and wife. *303 Prior to October 1, 1946, Robert R. Walker was engaged as a sole proprietor in the business of transporting automobiles. Robert R. Walker, Inc., hereinafter sometimes referred to as the corporation, was organized under the laws of Indiana in 1946 and took over the business of transporting automobiles in that year. The corporation had 750 shares of common stock outstanding during the years in issue. Walker was the record owner of 748 shares, and 2 shares were held by his nominees. He was president and treasurer of the corporation during such years, and Wanda A. Walker was secretary. The corporation has never declared or paid a formal dividend. The individual petitioners filed joint Federal income tax returns for the calendar years 1957 through 1961. The corporation filed returns for the same calendar years. The returns were filed with the district director of internal revenue at Indianapolis, Indiana. During the years 1946 through 1953 the corporation transported automobiles for the Studebaker Corporation from South Bend, Indiana. In 1954 Studebaker and Packard merged to form Studebaker-Packard Corporation. The corporation transported automobiles for Studebaker-Packard, hereinafter *304 referred to as Studebaker, from 1954 through 1961. The corporation had certificates of convenience and necessity from the Interestate Commerce Commission, hereinafter sometimes referred to as the ICC, to transport, as a common carrier, motor vehicles from South Bend to points in Indiana, Texas, Louisiana, Arkansas, Mississippi, South Carolina, and western North Carolina. In 1958 the ICC granted additional authority to the corporation to operate to Alabama, Georgia, Tennessee, New Mexico, and eastern North Carolina. The corporation's board of directors consisted of Robert R. Walker, Wanda A. Walker, and Beare C. Philipson, an employee of the corporation, who was vice president. The minutes of the board of directors show adoption of the following resolutions as of the dates indicated: April 15, 1952: WHEREAS, this corporation can profit little through advertising or selling as those terms are commonly used; and WHEREAS, the continuance of this corporation depends to a large extent upon the good will of its principal customer's executives, who are not interested in the type of entertainment customarily furnished by mercantile and manufacturing concerns; and upon the good *305 will of those of its customers' dealers who are situated in the territory into which the corporation transports, many of whom visit South Bend frequently; and WHEREAS, the success of the operational phase of the corporation's business depends to a considerable extent on the morale of its employee personnel, which could be improved by providing said employee personnel with suitable entertainment and recreational facilities; and WHEREAS, the good will of such executives and dealers and a high morale among such employee personnel must exist if this corporation is to prosper and expand; and WHEREAS, the Board of Directors of this corporation believes that the continuance and success of the business can best be secured by furnishing entertainment and recreational facilities to such executives, dealers, and employee personnel at some nearby lake; be it RESOLVED: That the President be and he is hereby authorized, empowered and directed on behalf of this corporation forthwith to procure a desirable tract of real estate at some lake located near the City of South Bend, Indiana, and to cause to be erected thereon and furnished and operated a lodge suitable for entertaining for business *306 purposes, and also to procure suitable recreational equipment for use in connection therewith; FURTHER RESOLVED: That the President be and he is hereby charged with the responsibility of carrying on and coordinating a program of entertainment through said lodge facilities designed for the best interests of the corporation; that the corporation recognizes that for properly carrying out and coordinating said program it will be necessary for some person representing this corporation to occupy the lodge during part of the year; that during such occupation such person may incidentally gain some personal benefits, the expense of which should be borne by him and not by the corporation; that since the corporation cannot accurately determine at this time the value of such personal benefits any representative of this corporation who occupies said lodge shall be charged the fair and reasonable value of such personal benefits. May 29, 1953: RESOLVED, that the President be and he is hereby charged with the responsibility of carrying on and coordinating a program of entertainment through said lodge facilities designed for the best interests of the corporation. FURTHER RESOLVED, that this *307 Board believes that such program will best be carried out if the President and his family occupy the Lodge during the summer months. FURTHER RESOLVED, that the President be charged the sum of $10.00 a day per member of his family for food and lodging furnished when the President is not entertaining guests of the corporation. In the latter part of 1952 the corporation commenced construction of a lake-front residence located on Diamond Lake near Cassopolis, Michigan. The residence was completed in 1953. The total cost to the corporation of building and equipping the property was as follows: Land
$ 15,000.00
Structures
149,604.42
Improvements
20,496.72
Equipment
17,060.76
Furniture and fixtures
19,124.48
Tools and equipment
4,034.73
Recreational furnishings
7,772.83
Boat
4,940.00
Total
$238,033.94
Diamond Lake is located about 25 miles north of South Bend. It is a 1,000-acre lake with a 40-acre island in the center. It is an area of year-round and summer lakefront homes of high quality. The lake-front property, built by the corporation, is a brick and redwood residence of 10 rooms suitable for year-round use, with facilities for easy maintenance *308 and luxurious living. It was equipped for entertaining on a large scale, and two boats were furnished and maintained by the corporation for use in connection with it. The house had the latest music reproduction equipment. A putting green was constructed adjacent to the house. The corporation paid for all food and liquor consumed and all wages for domestic help and maintenance. In 1958 the amount of $600 paid to the piano tutor for Walker's son was included in the wages paid by the corporation. In 1957 Walker sold his house in South Bend and with his family spent the summers through 1961 at the Diamond Lake residence and winters in Palm Springs, California. After 1961 the Walkers moved to Oakland, California. Walker paid the corporation $10 per person per day for each day a member of his family was present at the Diamond Lake residence. Walker entertained extensively at the Diamond Lake residence during the years 1957 to 1961, having guests two or three times a week and every weekend during the summer season. In much of this entertainment, guests were invited who were executives or junior officers of Studebaker. Also, on occasion, Walker invited officers of Studebaker to make *309 use of the facilities of the lake residence for conducting business meetings. In addition, he sometimes entertained dealers from the areas to which the corporation was making deliveries of Studebaker vehicles. Some photographs of new model Studebaker automobiles were taken using the lake residence as a background. In the years 1957 through 1961 the corporation paid the following expenses relating to the Diamond Lake property: 1957
1958
1959
1960
1961
Wages
$ 3,675.41
$ 2,121.66
$ 1,078.65
$ 4,462.75
$ 5,343.25
Food
3,887.47
1,394.15
1,899.73
2,470.66
2,345.47
Utilities
1,976.21
1,102.10
1,283.88
1,372.15
1,497.50
Miscellaneous supplies
1,586.77
1,347.96
1,166.82
1,902.14
3,523.94
and expense
Repairs anad
10,967.63
3,985.15
2,677.31
1,588.42
3,465.64
maintenance
Recreational expense
82.75
631.06
710.57
1,244.62
864.04
Taxes on Lake property
867.45
839.90
1,049.08
981.06
1,102.89
real estate
Other Michigan taxes
450.93
485.01
460.46
552.76
585.72
Insurance
776.10
759.37
776.64
816.86
892.09
Total
$24,270.72
$12,666.36
$11,103.14
$15,391.42
$19,620.54
In addition, the corporation claimed *310 deductions for depreciation on such property in the following amounts: Year
Amount
1957
$9,383
1958
9,361
1959
8,891
1960
$8,639
1961
7,226
Walker paid the corporation the following amounts on account of his use of the Diamond Lake property: Year
Amount
1957
$3,010
1958
4,290
1959
3,410
1960
3,570
1961
3,120
The expenses paid and depreciation claimed by the corporation with respect to the Diamond Lake property for the years 1957 through 1961, in excess of the amounts paid by Walker to the corporation for its use, were not ordinary and necessary business expenses of the corporation and were constructive dividends to Walker, except to the extent of $2,100 per year. In the year 1957, $401.10 in expenses was incurred in connection with a proposed sale of the business of the corporation to a competitor, Dallas & Mavis. This item was paid by the corporation in 1957. One-half of this was not an ordinary and necessary business expense of the corporation. In March 1957, expenses of $769.83 for travel to Miami, Florida, and Dallas, Texas, were incurred by Walker and paid for by the corporation. These were ordinary and necessary business *311 expenses of the corporation. In June 1957, expenses of $393.65 for travel to Dallas, Texas, were incurred by Walker and paid for by the corporation. Walker made this trip to take part in a golf tournament. This expenses was not an ordinary and necessary business expense of the corporation. In the year 1957, $398 in travel and entertainment expenses were incurred by Walker in appearing at a hearing before the Interstate Commerce Commission in Chicago for the corporation. This item was a capital investment by the corporation. In the year 1958, expenses of $344.82 for travel and entertainment were incurred by Walker in appearing at an Interestate Commerce Commission hearing in Chicago for the corporation. This appearance was in connection with two applications. One was granted and one was denied. One-half of this amount was a capital investment by the corporation. In 1960 Walker charged the corporation $1,650.73 for travel and entertainment expense in attending hearings before the ICC in connection with claims of competing carriers. Of this amount $269.50 was charged for entertainment. The entertainment charge was not an ordinary and necessary business expense of the corporation. *312 The other charges, amounting to $1,381.23, were ordinary and necessary expenses of the corporation in 1960. In 1960 Walker charged the corporation $35 for entertainment in California of a former Studebaker executive and his wife and son. He also charged other amounts to the corporation in 1960 for entertainment, none of which were ordinary or necessary business expenses of the corporation. In 1961 Walker charged the corporation $15.04 for a trip to Detroit to attend a meeting of the National Automobile Transporters Association. This was an ordinary and necessary business expense of the corporation. Other items he charged to the corporation for entertainment and golf expenses were not ordinary and necessary business expenses of the corporation. In the years 1958 to 1961 the corporation made certain reimbursements to Walker covering expenses purportedly incurred by him in connection with the business of the corporation. These included meals and lodging, dry cleaning and laundry, and entertainment expenses at Palm Springs, California; also travel expenses, including air fare, hotel, and miscellaneous expenses. The items classified as meals and lodging at Palm Springs were computed *313 on the basis of $25 per day for the days spent by the Walkers at Palm Springs. The amounts of such Palm Springs expenses and of other travel expenses were as follows: 1958
1959
1960
1961
Palm Springs
Expenses
Lodging and meals
$2,485.00
$4,190.00
$3,875.00
$3,425.00
Entertainment
356.44
164.95
1,106.41
2,787.90
Other expenses
140.20
305.90
115.35
154.75
Travel Expenses
Air fares
564.99
794.95
1,136.88
280.00
Other entertainment
134.75
857.41
863.40
Other expenses
256.25
159.04
1,188.13
328.55
Totals
$3,802.88
$5,749.59
$8,279.18
$7,839.60 The entertainment items above included 37 charges in 1960 and 45 in 1961. In addition, the corporation reimbursed Walker in 1959 for costs of a trip to Montego Bay, Jamaica, amounting to $830.97, which included $87 for entertainment. This trip was made to inspect beach property and a golf course in Jamaica. Walker acquired some property there and took title in a new corporation, Wanda Properties, Ltd., a subsidiary of the corporation. This expenditure was a capital investment by the corporation. Walker was interested in playing golf and played at the following country clubs, *314 among others: Bob-O-Link, located at Highland Park, Illinois; Thunderbird, located at Palm Springs, California; Shadow Mountain, also at Palm Springs, California; and Morris Park, at South Bend, Indiana. A membership in Thunderbird was held in the name of the corporation; membership in the three other clubs named were held in Walker's name. The corporation paid the following club dues in the years indicated: Shadow
Year
Bob-O-Link
Thunderbird
Mountain
Morris Park
1957
$166.80
$483
1958
379.25
483
1959
199.95
630
1960
240.00
480
$144
$293
1961
240.00
480
162
25
In addition thereto the corporation paid a building fund assessment at Thunderbird in the year 1960 in the sum of $1,350. The assessment was a capital investment by the corporation. The dues paid were not ordinary and necessary business expenses of the corporation and represented constructive dividends to Walker. The operating profit or loss of Studebaker and its net income or (loss) after taxes and special charges were as follows in the years indicated: Net Income or (Loss)
Operating
After Taxes and
Year
Profit or (Loss)
Special Charges
1960
($ 1,562,440)
$ 708,850
1959
28,641,424
28,544,338
1958
( 14,320,108)
( 13,390,937)
1957
( 11,694,725)
( 11,135,108)
1956
( 42,535,107)
( 103,318,257)
1955
( 31,215,320)
( 29,705,093)
1954
( 41,653,031)
( 26,178,315)
1953
11,642,981
5,440,966
1952
11,830,940
5,618,263
*315 The corporation performed services for Studebaker other than transport of automobiles. These, referred to as "special services," included storage of new automobiles, release of new automobiles to retail purchasers who came to South Bend, release of trucks to dealers, and preparing Mercedes Benz automobiles, for which Studebaker was agent, for delivery. The following table shows the relationship between the Studebaker production at South Bend and the revenues of the corporation from transporting automobiles and from other services to Studebaker and the net earnings of the corporation: (Thousands omitted)
Studebaker
Corporation
Production
Carrier
Special Service
Net Profit
Year
(Units)
Revenues
Revenues
Before Taxes
1953
230,170
$2,399
$19
$222
1954
123,117
1,022
36
26
1955
141,221
1,346
12
52
1956
106,790
1,115
14
24
1957
87,688
1,183
62
67
1958
70,252
1,030
26
30
1959
172,922
$3,312
$42
$378
1960
123,891
1,950
55
191
1961
92,539
387
81
(80)
The minutes of the corporation show the following further resolutions of the directors as of the dates indicated: May 1, 1957: RESOLVED, that *316 no dividend be declared at this time. FURTHER RESOLVED, that the President be and is hereby authorized and directed to make a canvass of those businesses which might be for sale and which might be successfully blended into the operations of the Corporation and to report to the Board in due course the results of his canvass; FURTHER RESOLVED, that the Corporation hold itself in a strong liquid position to the end that it is in a position to take advantage of any opportunity for the acquisition of a desirable business enterprise. October 16, 1957: The President reported that pursuant to the direcors [Directors] given to him by the Board of Directors at a meeting held May 1, 1957, he had made an investigation of a number of business operations which might be acquired by or merged with the Corporation. Among these were the following: Motor Dispatch, Pittsburgh, Pa.
Miller Transportation, Inc., Kokomo, Indiana
Great American Transport, Inc., Detroit, Michigan
Bolin Drive-away Company, Cleveland, Ohio
Dallas & Mavis Forwarding Company, Inc., South Bend, Indiana
The details of the terms under which said businesses might be acquired or merged were discussed at length *317 and it was then decided by the Board that none of said businesses was attractive, with the exception of a possible merger with the Bolin Drive-away Company. The President was directed to explore further the possibilities of a merger with Bolin Drive-away Company, and to call a meeting of the Board at such time as he felt that the matter was ready for further consideration by the Board. March 3, 1958: RESOLVED, that Robert R. Walker, President of the Corporation, be and he is hereby authorized, empowered and directed on behalf of the Corporation: (a) To make a thorough study and investigation of business opportunities and projects in the State of California; (b) To make contacts at Palm Springs, California, and at such other places as he may select for the purpose of learning of attractive ventures in which the Corporation may engage; (c) To engage in such ventures as he believes will be successful; (d) In his discretion to cause corporations to be organized and to subscribe for stock in and to lend money to such corporations which may carry out such ventures; (e) To acquire real estate and to erect improvements thereon, either through this corporation or through subsidiaries, *318 and to participate with others in such ventures; (f) To do all things which he deems necessary or advisable for the successful operation of this corporation and of the ventures in which it may engage either directly or indirectly. August 28, 1958: The Chairman reported that pursuant to the direction of the Board issued May 1, 1958, he went to Oakland, California to make a study of apartment house conditions in that city; that he determined that the Corporation might participate with profitable results in the building of an apartment house in Oakland; that he had been in contact with L. C. Guthrie, Jr., a California architect and engineer; that Guthrie proposed to enter into an agreement with the Corporation, a copy of which agreement is attached to the minutes of this meeting. Thereupon, and upon consideration thereof, it was on motion duly made, seconded and unanimously carried RESOLVED, that Robert R. Walker, President of the Corporation, be and he is hereby authorized and directed on behalf of the Corporation to execute an agreement with L. C. Guthrie, Jr., a copy of which agreement is attached to the minutes of this meeting; FURTHER RESOLVED, that the President be *319 and he is hereby authorized, empowered and directed on behalf of the Corporation to carry out the terms of said agreement. The corporation's books showed the following amounts recorded as loans or investments in subsidiary corporations in the taxable years: Wanda
Properties
Year
El Dorado
Madison
Co., Ltd.,
Ended
Investment
1200 Lake
Walnut Creek
Management
Grand Cayman
12/31
Company
Shore, Inc.
Properties,
Company
Island, Bahamas
Total
Inc.
1957
1958
$126,368
$126,368
1959
268,000
$253,807
$95,793
$6,000
$31,158
654,758
1960
370,000
286,807
30,774
6,000
31,158
724,739
1961
390,000
354,807
30,774
2,500
22,377
800,458
1962
395,000
332,307
30,774
2,500
22,377
782,958
1963
418,923
351,121
30,774
2,500
22,377
825,695
El Dorado Investment Company is a corporation organized on May 28, 1958, under the laws of the State of California. At the time of its organization, 800 shares of the 1,000 outstanding shares of capital stock were owned by the corporation. The remaining 200 shares were owned by L. C. Guthrie. On November 12, 1959, the corporation acquired 100 shares *320 from L. C. Guthrie. El Dorado Investment Company's corporate activities consist of owning and managing property in Oakland, California. 1200 Lake Shore, Inc., is a corporation organized on March 3, 1959, under the laws of the State of California. From the time of its organization to the present date it has been a wholly owned subsidiary of the corporation. 1200 Lake Shore's corporate activities consist of owning and managing property in Oakland, California. Walnut Creek Properties, Inc., is a corporation organized on March 3, 1959, under the laws of the State of California. At the time of its organization 2,400 shares of capital stock were issued. They were then held as follows: 1,800 shares to Robert R. Walker, Inc.
200 shares to Edgar B. Stewart 400 shares to James E. Herbert. Three hundred twenty-five of James Herbert's 400 shares were subsequently purchased by the corporation and became treasury stock. Walnut Creek Properties, Inc.'s, corporate activities consist of owning and managing property in Oakland, California. Madison Management Company is a corporation organized on March 30, 1959, under the laws of the State of California. From the time of its organization *321 to the present, Madison Management Company has been a wholly owned subsidiary of the corporation. Madison Management Company's corporate activities consist of owning and managing property in Oakland, California. In 1957 and 1958 Walker borrowed large amounts from the corporation. The corporation's books showed the amount of $10,376.27 due him on January 1, 1957, and showed that he owed the corporation $238,636 on January 31. The amount due the corporation increased to $304,372.33 on November 30, 1957. He repaid the loan, and on December 31, 1957, the books showed that the amount of $9,682.47 was due him. He again borrowed from the corporation, and by February 28, 1958, he owed it $253,327.38. This was later reduced and was substantially repaid by the end of 1958. The earnings and profits of the corporation were permitted to accumulate in 1957 beyond the reasonable needs of the business. The corporation was availed of in 1957 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. The corporation paid Wanda A. Walker, who was secretary of the corporation and a member of the board *322 of directors, compensation of $2,400 per year during each of the years from the time of the formation of the corporation through the year 1961. Her services to the corporation in the taxable years included serving as hostess in the entertaining carried on at Diamond Lake, planning the meals, doing the marketing, and helping make out the guest lists. Reasonable compensation for her services in the years 1957 through 1961 was $2,400 per year. The individual petitioners' income tax returns showed deductions for interest paid but not for interest paid to the corporation. The returns reported the following amounts of income and tax: 1957
1958
1959
1960
1961
Salary from
$28,935.09
$45,758.41
$52,436.17
$50,400.00
$32,025.00
corporation
Other income
14,478.20
34,017.03
17,423.94
(Loss)
(Loss)
Adjusted gross income
43,413.29
79,775.44
69,860.11
42,101.90
14,223.56
Income tax
9,669.69
30,014.89
25,761.07
6,704.96
None
The corporation's tax returns showed the following amounts: Gross
Taxable
Year
Receipts
Income
Income
Tax
1957
$1,183,339.52
$390,653.74
$ 66,996.03
$ 27,987.61
1958
1,030,208.29
299,131.03
31,243.00
10,499.89
1959
3,417,256.04
932,153.68
378,383.84
191,259.60
1960
2,000,316.56
647,384.91
192,020.47
94,350.64
1961
473,517.68
203,386.38
(80,417.00)
*323 The comparative balance sheets of the corporation at the end of the years 1955-1958 are: Dec. 31, 1955
Dec. 31, 1956
Dec. 31, 1957
Dec. 31, 1958
Cash
$ 470,718.63
$ 484,062.82
$ 596,437.57
$ 361,986.12
Fixed assets less
583,551.55
540,311.49
491,914.95
499,560.23
depreciation
Land
123,993.94
123,993.94
123,993.94
123,993.94
Total assets
1,245,761.00
1,241,836.01
1,285,564.50
1,345,011.68
Accounts payable
$ 44,068.12
$ 36,749.77
$ 34,579.93
$ 65,158.28
Other liabilities
72,801.52
76,984.75
83,625.79
92,134.93
Capital stock
375,000.00
375,000.00
375,000.00
375,000.00
Surplus and undivided
753,891.36
753,101.49
792,358.78
812,718.47
profit
Total liabilities and
1,245,761.00
1,241,836.01
1,285,564.50
1,345,011.68
capital
The corporation's tax returns for the years 1954-1957 showed the following amounts of income and expenses: Total
Total
Year
Income
Deductions
1954
$318,612.38
$291,875.93
1955
375,392.25
320,895.28
1956
336,075.11
311,250.25
1957
390,653.74
323,657.71
The respondent determined that the following amounts of the expenses of the Diamond Lake property were *324 not allowable deductions to the corporation: Paid by
Total
Peti-
Allow-
Dis-
Year
Expenses
tioner
able
allowed
1957
$28,495.68
$3,010
$2,100
$23,385.68
1958
21,365.90
4,290
2,100
14,975.90
1959
19,561.49
3,410
2,100
14,051.49
1960
23,878.60
3,570
2,100
18,208.60
1961
26,847.39
3,120
2,100
21,627.39
Respondent determined that the following amounts claimed on the corporation's return as deductions for business expenses, including travel and entertainment were not allowable deductions: Amount on
Determined
Year
Return
Unallowable
1957
$ 4,816.19
$1,762.03
1958
7,038.86
4,065.27
1959
11,699.77
6,424.51
1960
10,456.85
8,434.64
1961
11,170.24
7,948.64
Respondent determined that certain expenses paid by the corporation and disallowed as business expenses to it constituted dividends to the individual petitioners in the amounts stated: Recreation Ex-
penses and Use
Club Dues,
Personal
of Diamond
Assessments
Travel and
Year
Lake Property
and Costs
Entertainment
Total
1957
$23,385.68
$ 649.80
$1,163.48
$25,198.96
1958
14,975.90
862.25
3,892.86
19,731.01
1959
14,051.49
829.95
5,593.54
20,474.98
1960
18,208.60
2,557.00
8,434.64
29,200.24
1961
21,627.39
907.00
7,948.64
30,483.03
*325 The respondent computed the accumulated earnings tax for 1957 as follows: Taxable income revised
$94,593.54
Less capital gain
$5,001.23
Less applicable tax
1,250.31
(3,750.92)
Federal income tax per return
(27,987.61)
Accumulated taxable income
$62,855.01
27 1/2% of $62,855.01
17,285.13
Opinion This case, as respondent contends, involves a flagrant attempt by a sole shareholder to manipulate his captive corporation so as to provide himself with tax-free income to satisfy his personal desires while deducting such distributions at the corporate level. Walker caused his corporation to expend nearly a quarter of a million dollars on construction of a luxury residence on Diamond Lake which served as a summer home for him and his family and to pay for all the expenses of the home, including food, beverages, and wages of domestic and maintenance employees. The corporation claimed depreciation deductions on the property and business expense deductions for the expenses of the home. The amounts which he paid to the corporation for his family's use of the place were nothing more than token payments. In addition, he made inroads on the corporate treasury *326 in conjunction with his family's wintering in California in charging to it "per diem expenses" at the rate of $25 per day for each day that he and his family resided at Palm Springs, and also his laundry and dry cleaning bills and various other expenses. Again, the corporation claimed deductions of these expenses as business expenses. Walker entertained extensively at both Diamond Lake and Palm Springs and treated the costs of such entertainment as business expenses of the corporation. The respondent says this was principally the personal and social entertainment of a gracious host. Walker was obviously a highly social person who delighted in entertaining others. There were guests at the lake home several times each week and at every weekend during the summer season. The charges for entertaining a Palm Springs were not numerous in 1958 or 1959, but in 1960 Walker charged the corporation over $1,900 for entertaining 37 times and in 1961 charged it $3,600 for entertaining 45 times. When he travelled to other cities he frequently entertained and charged the cost to the corporation. The guests at the lake home included Studebaker executives, business or professional men of South Bend, *327 and other personal friends of the Walkers and the wives of all of these. The guests entertained in California were personal friends and prospective participants in business ventures contemplated in California for investment of the corporation's funds. These ventures were handled through new corporations formed by Walker and his new associates and financed by having the corporation acquire controlling stock for cash. The respondent's characterization of Walker's course of action as manipulation of his corporation for his personal benefit is justified from an examination of the facts. The luxurious lake residence provided a comfortable summer home with all expenses paid, and its facilities enabled him to indulge extensively in his penchant for entertaining while paying only a nominal part of the cost. Although Wanda testified that she did not enjoy the summers there and felt that the children were neglected, there is no indication that her husband was not fully enjoying himself. Also, his practice of charging the corporation for a part of the expenses of wintering in California on the basis alleged of searching for new lines of business for the corporation tends to support the respondent's *328 view. In a sense, any corporation may be constantly on the lookout for new and potentially profitable lines of business, but for a corporation, the business of which is in and near Indiana, to pay a large part of the personal and living expenses of its controlling stockholder while spending a winter vacation in California on the ground that he is charged with the responsibility of searching for a new field of occupation for its funds and staff is carrying the business expense claim too far. The minutes of the controlled board of directors to this effect are self-serving "window dressing" and are not persuasive. Several minor items further support the conclusion that Walker was taking improper advantage of his control of the corporation. Among the wages charged to it for the lake residence was the fee for the piano tutor for his son. Walker enjoyed golf and had the corporation pay fees for four club memberships, two of them in California. He took part in a golf tournament at Dallas and charged the expenses of the trip to the corporation. He charged the corporation for the expense of entertaining in California a former officer of Studebaker who was a friend previously entertained at *329 the lake and who was no longer in a position to favor the corporation. The respondent determined that the expenses claimed on the corporation's returns with respect to the Diamond Lake property were not deductible, were not substantiated, and for the most part constituted personal expenses of the principal stockholder. These expenses exceeded $100,000 in the five years 1957 through 1961, of which the respondent allowed $2,100 for each year and disallowed the remainder. The corporate petitioner contends that the expenses incident to the property were ordinary and necessary expenses of its business, the property, referred to as a "lodge," being used for the entertainment of customers; that the "customers" were the executives of Studebaker, the sole source of business for the corporation which was a common carrier; that Studebaker could ship by rail or by other carriers, and the corporation had no basic contract giving it exclusive rights; that the directors considered it essential to maintain good relations with Studebaker and to persuade its executives to support the corporation's application to the ICC for authority to transport automobiles to territories other than those in its *330 earlier authorizations; and that the lodge was intended for business entertainment, as stated in the corporate minutes authorizing its construction, and it was used for such entertainment. The corporation argues that the most important return it received was the acquisition of new territories it began serving in 1959, and that in that year the profits, after expenses of the lodge, were at least $156,000 more than for any prior year of Studebaker production; and that its investment in and maintenance of the property was justified as a business venture, the return being far in excess of the deductions claimed. The corporation explains that its previous applications to the ICC for additional authority to transport automobiles were not supported by the Studebaker representatives appearing at the hearings and that a better acquaintance with the ranking officials of that company was believed essential to insure its support of a further application. Therefore, a program involving entertainment of and conferences with such officials was undertaken to improve the corporation's prospects for additional business. The corporation was able to get additional income from Studebaker by performing *331 what are described as special services, and in 1958 the ICC granted the corporation additional territorial delivery rights. It is alleged that Studebaker's support of the corporation's application to the ICC and arranging for the special services were the consequences of the entertainment program. The corporation says further that in 1961 Studebaker reduced the number of carriers transporting cars and would have stopped using the corporation except for Walker's friendship with a Studebaker executive who had been entertained at the lake. Until 1958 the corporation's sole business was transporting and delivering motor vehicles for Studebaker. The acquisition and improvement of residential property in a resort area was not essential to this business. It was not a part of the corporation's business to provide a home for its officer or stockholder. Here the corporation has built, furnished, and maintained a luxury residence for the use of its sole stockholder in which he, at its expense, has lavishly entertained his friends and persons having a business connection with a manufacturing company for which the corporation performs delivery services. The corporation invested $238,000 in the *332 home and equipment, and in the five years 1957 through 1961 claimed deductions for depreciation in the amount of $43,500 and deductions for maintenance and living expenses amounting to more than $75,000. Walker paid only $17,400 in this period for his family's use of the residence and for food. The respondent does not deny that there was some business relationship between the entertainment at Diamond Lake and the business of the corporation and has allowed as a deduction on this account the amount of $2,100 for each year, or $10,500 for the period in issue. We are not persuaded that the favorable developments were entirely or even largely the consequence of the Diamond Lake entertainment. The corporation had an adequate terminal facility at South Bend and was well equipped to care for the special services which Studebaker desired to have performed. The support of the ICC application was in the interest of Studebaker to have delivery service to the new areas as was the retention of the corporation as a carrier in view of the territorial rights it had. The corporation's claims to the deductions are supported only by the testimony of Walker and two of his personal friends who were formerly *333 employed by Studebaker but for the most part not during the years in issue. The former Studebaker officers testified that their decisions were made in the interest of that company and not because of the entertainment. In Challenge Manufacturing Co., 37 T.C. 650, 660 (1962), we pointed out that the deduction for costs of entertainment is one peculiarly susceptible of abuse. In our opinion the corporation's claim here is a gross abuse of the privilege of deducting, as business expenses, the cost of entertainment. However helpful the program may have been in Walker's opinion, it is not ordinary, nor is it appropriate, as a business practice, for a corporation to entertain so frequently and so lavishly the responsible officers of another corporation to induce them to favor it. See Welch v. Helvering, 290 U.S. 111 (1933). We receive the impression that Walker enjoyed playing the host and that the entertainment of people was in the nature of a hobby which he followed at the expense of his corporation, the business relation of it being only a minor factor. The evidence does not establish that these expenses in excess of the amounts allowed by the respondent were *334 ordinary and necessary business expenses of the corporation. See Challenge Manufacturing Co., supra; United Analine Co. v. Commissioner, 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court; Louis Greenspon, 23 T.C. 138 (1954), affd. on this issue 229 F. 2d 947 (C.A. 8, 1956); American Properties, Inc., 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958). The respondent disallowed deductions claimed by the corporation as business, travel, or entertainment expenses. Among these amounts were reimbursements to Walker for per diem, travel, and entertainment at Palm Springs in southern California where he and his family spent the winter seasons in the taxable years. These expenses were admittedly unrelated to the automobile transporting business in South Bend. The corporation alleges that Walker was engaged in a search for new businesses for the corporation when Studebaker production began to fall off. He charged the corporation $25 per day, apparently for the entire time spent in California, plus certain living expenses, air fares, and entertainment expenses. Walker entertained *335 extensively in Palm Springs. He explains that he was entertaining prospective investors, some of whom did invest in the ventures later undertaken in California. He details many of the particular entertainment expenses, naming the persons entertained and stating whether they invested in the California ventures of the corporation. Some were celebrities in the motion picture or television field, others were officers of Ford Motor Company or Studebaker. It is noted that these ventures were principally located in northern California, at Oakland, which is over 400 miles from Palm Springs. Even if we look upon the challenged expenses as related in some way to the business of the corporation, they were primarily in connection with the investigation of potential new business ventures and preparing to enter them rather than in carrying on such businesses or the existing business 6f the corporation. As such, these are not deductible. They may represent capital investments or personal expenses, but are not deductible by the corporation. The corporation concedes that certain of the Palm Springs expenses for food, lodging, travel, and entertainment disallowed to the corporation which were paid *336 in relation to what it refers to as its real estate program should be capitalized as costs of acquisition rather than deducted as business expenses. These, according to the corporation, amounted to $3,677.70 in 1958; $6,533.71 in 1959, $6,017.43 in 1960; and $7,195.30 in 1961. There are a number of items of expenses claimed as deductions by the corporation and disallowed by the respondent which require specific decisions. In June 1957 Walker went to Dallas, Texas, to take part in a golf tournament. He charged $393.65, representing the expenses of this trip, to the corporation. He testified that he made it a point on such a trip to visit Studebaker dealers or representatives there. Even if he did so, the charge of the entire cost of the trip was unwarranted. There is no evidence that he did so visit on this occasion. The disallowance of this item must be sustained. He held memberships in three golf clubs and had the corporation hold a membership in another. He had the corporation pay the dues at each of the four clubs and an assessment at the one held in its name. Respondent disallowed the deductions claimed by the corporation for these payments. The corporation concedes that the *337 assessment was a capital item, but contends that the memberships were held for business purposes and that the dues were business expenses. The two California clubs were at Palm Springs and were used primarily for Walker's enjoyment of the game. They were far removed from the corporation's place of business at South Bend and also far from the place of its later real estate investments at Oakland. The club at Highland Park, Illinois, near Chicago, is distant from South Bend. The club at South Bend was used only in 1960 and 1961, at which time the corporation's principal investments were at Oakland. Walker used the clubs for his pleasure and for social contacts, but the use for purposes of the corporation's business was minimal. We find no error in the respondent's disallowance of the club dues as business expenses of the corporation. Respondent's disallowance of $1,762.03, claimed by the corporation in 1957 for travel expenses, involves four items. One is the item of $393.65 for the trip to Dallas for a golf tournament, mentioned above. Another is the disallowance of one-half of $401.10 expended in connection with a proposed sale of the corporation's business to an outside party, Dallas *338 & Mavis, a competing carrier. The sale was not effected. Expenses relating to the sale of a business are not ordinary and necessary expenses of doing business. The corporation has shown no basis for allowance of this item and we sustain the disallowance. A third item is $769.83 paid for travel to Miami and Dallas. The trip to Miami was to investigate a possible business connection with an air freight line. The Dallas visit was in part to confer with a Studebaker regional officer in the corporation's territory. We find this item allowable as an ordinary and necessary expense. The last item was $398 incurred in appearing at an ICC hearing, which the corporation concedes to be a capital expenditure. Respondent's disallowance of travel and entertainment expense for 1958 includes $172.41 as one-half of an item of $344.82 incurred in appearing at an ICC hearing in Chicago involving two applications, one of which was granted and one denied. It is conceded that the disallowed amount was a capital item. A further item of $109.09 was disallowed, which the corporation contends was for entertainment of customers and suppliers. This was for dinners for several of Walker's friends and their wives. *339 The evidence does not prove that this was a business item, and we sustain the disallowance. Respondent's disallowance of travel and entertainment expense for 1959 involves an item of $830.97 for a trip to Jamaica which is conceded to be nondeductible as being costs of acquisition of new business. Other items claimed by the corporation of $65, $69.75, $32, $86.20, and $46.75 were for entertainment of friends and potential investors and are not proved by the evidence to be allowable deductions to the corporation. We sustain the respondent's disallowance of such claimed deductions for 1959. Respondent's disallowance of travel and entertainment expense for 1960 involved payments for travel and entertainment amounting to $1,650.73 in connection with ICC hearings concerning applications of competing carriers. This amount includes four charges for entertainment aggregating $269.50. There is no explanation and no reason shown by the evidence justifying an entertainment charge in connection with a Government hearing. We sustain the respondent as to this, but find the balance of this expense, $1,381.23, to be allowable to the corporation as a business expense. Other charges of $651.68 for *340 entertainment of customers and suppliers, alleged to be business expenses, are not explained and were properly disallowed. Another item of $35 was paid for entertainment in California of a former Studebaker executive, his wife, and son. There is nothing to show that this was in connection with the corporation's business or that it was other than the entertainment of Walker's friends of several years past. This was correctly disallowed. Respondent's disallowance of travel, food and lodging, and entertainment expenses for 1961 involved an item of $15.04 for travel to a meeting of the National Automobile Transporters Association at Detroit in August, which we find is an allowable business expense of the corporation. Other items in the amount of $852.32 were for entertainment of customers and suppliers and expenses for golf. Much of the entertainment was for Studebaker people who were long-established friends of Walker. We find these items were properly disallowed by the respondent. The respondent determined that for the taxable year 1957 the corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to *341 accumulate instead of being distributed and that therefore the corporation was subject to the accumulated earnings tax as provided for in section 531 of the Internal Revenue Code of 1954. Prior to the deficiency letter herein, the respondent notified the corporation pursuant to section 534(b) that the proposed notice of deficiency included an amount with respect to the tax imposed by section 531. In this notice the corporation was given 60 days within which to submit a statement of the grounds on which it relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. The corporation submitted no such statement. The corporation explains that in 1957 its only customer, Studebaker, was experiencing a decline in business, was losing money, and its production was 40 percent of what it had been five years earlier; that because of the uncertain economic future of Studebaker the corporation was investigating new lines of business; and that beginning in 1958 it entered the real estate development field through subsidiaries in which it owned more than 80 percent of the stock. It says that the retention *342 of earnings in 1957 was with the intention of using these funds in the diversification of its business, a need reasonably anticipated from the decline of the business of Studebaker, which company later ceased production at South Bend, and that such action was planned in 1957 as shown by the minutes of its directors. The corporation points out that the respondent has not applied the accumulated earnings tax for later years when larger earnings were retained and infers that this was because of the diversification which began in 1958. It contends that the total accumulations at the end of 1957 were less than one year's operating expenses, a measure which this Court has said is not an unreasonable accumulation. J. L. Goodman Furniture Co., 11 T.C. 530 (1948), acq. 1949-1 C.B. 2; F. E. Watkins Motor Co., 31 T.C. 288 (1958), acq. 1959-1 C.B. 5. The holding in the cases cited above to the effect that a corporation is entitled to accumulate a cash reserve sufficient to cover one year's operating expenses is inapplicable here. The total deductions for expenses claimed on the corporation's returns were less than $322,000 for 1955, *343 $312,000 for 1956, and $325,000 for 1957. Some of the 1957 expenses are not allowable deductions. The corporation had $484,000 in cash at the beginning of 1957 and liabilities of $114,000. The cash surplus was $370,000 and at the end of the year was over $470,000. Assuming that the reasonable needs of the business required the retention of one year's operating expenses, or about $320,000, there was at the beginning of the year 1957 some $50,000 in excess of that amount, and this excess was increased by $100,000 in the course of the year. Where the accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, any earnings and profits of a later year which are retained may not be considered as retained for such needs. (Cf. Income Tax Regs., sec. 1.535-3(b)(ii).) It is apparent that the reasonable needs of the business of this corporation did not require retention of its earnings in excess of an amount sufficient to cover one year's operating expenses. In J. L. Goodman Furniture Co., supra, cited by the corporation, the needs of the business included cash for current operations, carrying inventory and *344 accounts receivable and for building branch stores. In F. E. Watkins Motor Co., Inc., supra, also cited, the reasonable needs of the business required funds for additional business buildings and to carry slow installment accounts and to comply with General Motors' requirements for working capital. In the present case the corporation carried no inventory and had no substantial amount of accounts receivable. There is no evidence to show a need for retention of so large an amount of cash. Although the corporate minutes indicate a concern for its future and a project to search for other sources of business, there was in 1957 no such definite and specific plan for use of these funds as would justify the postponement of a dividend distribution. None of this surplus was invested in 1957 and only $126,368 was invested in 1958. This was an investment in El Dorado, a corporation owning and managing property in California, a business totally unrelated to the transportation of motor vehicles. In the meantime the corporation loaned Walker more than $300,000 during 1957 and $250,000 during 1958, on which loans he paid no interest. As the respondent points out, the method of this *345 borrowing indicates an attempt to avoid a taxable dividend distribution in that Walker would borrow large sums early in the year and repay the loans just before the close of the year with funds borrowed personally elsewhere. In a similar situation where loans were made to a controlling stockholder and no dividends were distributed, the tax on accumulated earnings was upheld. United Business Corporation v. Commissioner, 62 F. 2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635, affirming 19 B.T.A. 809 (1930). One of the principal indications that earnings have been permitted to accumulate beyond the reasonable needs of the business is a record of loans to shareholders or of expenditures for their benefit. Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court. Such funds are not necessary to the business when removed for the use of someone else. Reasonable needs of the business are the immediate needs associated with the business in hand. McCutchin Drilling Co. v. Commissioner, 143 F. 2d 480 (C.A. 5, 1944), affirming a Memorandum Opinion of this Court. *346 The business of the corporation was transporting automobiles. The reasonable needs of this business do not include financing other unconnected activities of its stockholder or other unrelated businesses not then carried on by it or at least immediately contemplated at the time of the accumulation. Latchis Theatres of Keene, Inc., 19 T.C. 1054 (1953), affd. 214 F. 2d 834 (C.A. 1, 1954); K O M A, Inc. v. Commissioner, 189 F. 2d 390 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court; Dixie, Inc. v. Commissioner, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415, certiorari denied 364 U.S. 827. Walker was a comparatively high-bracket taxpayer. He caused the corporation to retain its earnings which he then borrowed and used for his personal activities unrelated to the corporation's business and thereby avoided a tax liability that would have been imposed upon him had a formal dividend been declared and paid. We have found that the corporation was availed of in 1957 for the purpose of avoiding the income tax with respect to its shareholder by permitting earnings and profits to accumulate *347 instead of being distributed. The corporation paid Wanda A. Walker a salary of $2,400 per year from the time it began operations. She was secretary and a member of the board of directors. In the years prior to 1957 the respondent allowed the deduction of this salary but in the years 1957 through 1961 allowed only $600 per year as reasonable salary. Her services to the corporation in the taxable years were not less than in earlier years. Walker drew as salary from the corporation amounts ranging from $26,000 to $50,000 in the taxable years, in addition to reimbursements of expenses. We find that reasonable compensation for the services of Wanda A. Walker to the corporation was $2,400 per year in the years 1957 through 1961. In the case of the individual petitioners the respondent determined that certain expenses paid by the corporation constituted constructive dividends. These expenses consisted of club dues, travel and entertainment expenses held not to be business expenses of the corporation, and the expenses of maintaining and operating the Diamond Lake home, less the amounts paid by Walker for use of the home and less the amounts allowed by the respondent for business use thereof. *348 Walker and his family had the economic benefit of a comfortable and expensive lake home for the summers at only a small fraction of the cost to the corporation for its construction and upkeep. He disputes the value of this residence, saying that the rental value for the summer was far less than the amounts determined to constitute income to him. There was testimony that the rental value of a home at Diamond Lake would not be in excess of $2,800 for a summer season of about three months and that this residence was later rented for $1,000 for a single month and for $600 monthly for the season, including utilities and use of the boats. These rents do not include the costs of maintenance or wages of domestic employees. The depreciation alone on the corporation's investment would exceed the amount that any tenant would be likely to offer for use of a summer place, and the rentals actually received in later years, when it was desirable to have it occupied pending sale rather than vacant, are not determinative of the value of the residence to the petitioner personally. It is well established that a shareholder receives taxable income in the amount a corporation spends in satisfaction of *349 his personal desires. American Properties, supra; Louis Greenspon, supra; Challenge Manufacturing Co., supra.The amounts disallowed as deductions for the corporation on account of the lake residence represent taxable income to the individual petitioners in accordance with this principle. The corporation paid country club dues for Walker's benefit at four golf clubs. He was an ardent golfer and these club dues were paid primarily, if not entirely, for his pleasure and benefit. One membership was held in the name of the corporation - that of the Thunderbird Club at Palm Springs. The corporation paid a building fund assessment of $1,350 in 1960 at that club which it is conceded should be capitalized. Since this represents an investment by the corporation, the respondent erred in treating it as income to Walker. Except for this item we sustain the respondent in treating the club dues as constructive dividends to Walker. Palm Springs in an amount exceeding $20,000, for which he was reimbursed by Walker concedes that expenditures at the corporation, are not ordinary and necessary business expenses of the corporation. However, he contends *350 that such expenses were necessary in the acquisition of new businesses acquired by the corporation through its subsidiaries and should be allocated to those investments and not treated as a constructive dividend to him. We are not convinced that these expenses and reimbursements represent capital investments by the corporation. The relationship of these items to the subsequent investments of the corporation in real estate promotions in Oakland, over 400 miles from Palm Springs where the expenditures were made, is too remote to justify such a conclusion. In our view Walker was merely drawing on his corporation's funds for part of his vacationing expenses and to carry on his enjoyment of entertaining others with the allegation of a business purpose as an attempt to justify these charges. These reimbursements also represent constructive dividends. Other travel and entertainment expense reimbursements likewise constitute constructive dividends except for those specific items we have found from the evidence to be ordinary and necessary expenses of the corporation and items of $398 in 1957 and $172.41 in 1958 in connection with the ICC hearings which are concededly capital expenditures. *351 Some of the items which Walker has charged to his controlled corporation as business expenses are so absurd and so remote from any possible relation to the corporation's business or future business as to render suspect other items as to which there might be some more likely business relationship. Also, since the controlled corporation had no real choice as to payment, the proof of the business relationship of items charged to it must be satisfactory if the respondent's disallowance is not to be sustained. We have examined many items and have found a few that meet this test. As to any which have not been specifically approved herein, we sustain the respondent's determinations. There appear to be some differences in the amounts involved in this case, since totals of the expenses disallowed in the deficiency notice to the corporation do not agree with the amounts shown by the corporation's records. The parties have stipulated concerning these differences and adjustment may be made in computations under Rule 50. Decisions will be entered under Rule 50.